## STATE v. DONALD THEODORE BOYCE.

170 N. W. (2d) 104.

August 1, 1969—No. 41397.

*Douglas Hall,* for appellant.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, *William B. Randall,* County Attorney, and *Warren E. Peterson,* Assistant County Attorney, for respondent.

SHERAN, JUSTICE.

Appeal from a judgment of conviction of the crime of manslaughter in the first degree and from an order denying a motion for a new trial.

On July 15, 1967, defendant, Donald Boyce, shot and killed Theo E. Merkel. Indicted for murder in the first degree, he waived his right to a jury trial. At the close of the evidence, the trial judge made this statement for the record:

"* * * [T]he state has proved beyond a reasonable doubt that * * * defendant, Donald Theodore Boyce, intentionally caused the death of another human being * * *; that the death of Theo E. Merkel as caused by the defendant, Donald Theodore Boyce, was not excusable or justifiable; * * * [T]he death of Theo E. Merkel was caused by the defendant, Donald Theodore Boyce,

while in the heat of passion resulting from anger, fright and undue excitement brought on by the tensions created by the total relationship of the parties involved, all of the circumstances surrounding the entire event, and words and acts of Theo E. Merkel and of all of the parties involved therein.

"It is the verdict of the Court that the defendant, Donald Theodore Boyce, is guilty of manslaughter in the first degree."

Upon appeal it is contended: (1) That the evidence does not support the verdict; (2) that the trial court in arriving at its decision applied Minn. St. 609.06, 609.065, and 609.20 in such a way as to deprive defendant of due process of law in violation of the Federal Constitution and the Constitution of the State of Minnesota; (3) that evidence of incidents occurring in June and July of 1966 tending to show a background of hostility as between defendant and the decedent was improperly received because the state had failed to notify defendant in advance that such testimony would be offered.

In addition to these issues, we are concerned by the fact that defendant's claim of self-defense was not determined by a jury.

An understanding of these problems calls for a discussion of defendant's personal background; the scene of the shooting; the events preceding July 15, 1967, the date of the shooting; the exchange of insults between defendant and Theo Merkel witnessed by Lane Cooper which occurred on July 15, 1967, shortly before the shooting; and the final stage of the fatal affair when the defendant shot Merkel in what he claims was an attempt to defend himself from an assault by the two other men acting in combination.

## The Defendant

Born January 24, 1935, at Chicago, Illinois, Donald Boyce has been a resident of St. Paul, Minnesota, since infancy. In 1952, while a junior in high school, he enlisted in the United States Marines, serving for 1 year in Korea and Japan during his 3-year tour of duty. He was discharged honorably with the rank

of corporal. He then worked briefly in New York, Chicago, and Tulsa, Oklahoma, returning to Minnesota in the fall of 1955 where he enrolled in the University of Minnesota for one quarter. He next worked in Chicago for about 2 years as a stock boy; attended Howard University in Washington, D. C., for one quarter; and then went back to Chicago where he was employed at various jobs for about 5 years, during which time he continued his college education. After his return to Minnesota in 1962, his employment included working as an automobile salesman and also as a licensed real estate broker. He was an admissions clerk at the University of Minnesota Hospitals on weekends. Boyce was married in January 1964 and has two children. Beginning in February 1964, he obtained employment as a tax examiner for the Minnesota Department of Taxation, continuing there until January 1967 when he secured a 6-month leave of absence in order to obtain a degree at Winona State College in June of that year. In the summer of 1967, he was associated with the Twin Cities Opportunities Industrialization Center, a vocational school for the training and general rehabilitation of underprivileged people, serving as director of administrative services with the responsibility for the management of its business affairs. His wife has been employed as a physical therapist at Mounds Park Hospital in St. Paul. Since their marriage, he and his wife have acquired an interest in a 7-unit kitchenette apartment building on Dayton Avenue; a house; and the four-plex located at 252 North Lexington. In connection with his real estate activities, he acted as rental agent for owners of other properties and, in 1963, because of the risks involved in carrying substantial amounts of cash, he purchased a .22-caliber revolver which he generally kept in the glove compartment of his Thunderbird automobile.

Although the record is incomplete as to the physical characteristics of Donald Boyce on July 15, 1967, it is inferable that he was considerably smaller than Theo Merkel, who was approximately 5 feet 10 inches and weighed about 190 pounds,

and Lane Franklin Cooper, apparently about 6 feet tall and weighing about the same as Merkel.

### The Scene

The significant facts in this case occurred in the vicinity of 252 North Lexington in St. Paul.

252 North Lexington, to be called the Boyce four-plex, is a two-story building which faces on Lexington Avenue immediately to the south of an east-west alley about 15 feet in width which runs through the block. The block is bounded by Marshall on the south and Iglehart on the north.

The distance from the sidewalk line on Lexington Avenue to the easterly boundary line of 252 North Lexington is about 100 feet. A hedge extends from the sidewalk to the northwest corner of the four-plex. Access to the front lawn of 252 North Lexington is possible through an opening in the hedge about 10 feet west of the northwest corner of the building. The four-plex is about 50 feet wide with the front entranceway at the middle of the building.

The four-plex itself covers the easterly half of the lot except for a strip of land about the width of an automobile which lies between the easterly line of this property and the roofed stairways and porches extending across the back end of the building.

1089 Marshall, to be called the Cooper house, faces on Marshall Avenue, but the back half of this lot adjoins 252 North Lexington to the east. A garage in the northeast corner of the lot is separated from 252 North Lexington by a parking area about 40 feet by 30—significant now because this parking area and the narrow strip east of 252 North Lexington share a common boundary line.

1086-1090 Iglehart are apartments facing on Iglehart with a parking area at the rear separated from the other parking places previously described by the alley.

### Events Preceding July 15, 1967

As of July 15, 1967, the day on which the killing occurred, defendant and the decedent, Theo Merkel, lived in the same neighborhood. They were hostile to one another.

This feeling of mutual antagonism had its inception in a dispute which occurred in the early summer of 1966. Boyce, then the owner of the four-plex, and Merkel, then a tenant in the building, argued about the use of the parking space to the immediate rear of the four-plex. As a result of this incident, Boyce terminated Merkel's tenancy. Tension was increased because some minor damage to the building was caused when the Merkels moved their furniture from the premises to another place of residence in the neighborhood.

The situation was further exacerbated when on July 6, 1966, Merkel, who rented garage space from Lane Franklin Cooper, owner of the premises immediately adjoining the four-plex to the east, parked his automobile near the common boundary line between these properties in such a way as to make it difficult if not impossible for Boyce to gain access to his premises. The confrontation which this action on the part of Merkel was apparently designed to accomplish did occur and resulted in an altercation during the course of which Boyce threatened Merkel with a hammer in the presence of a number of witnesses including Merkel's son-in-law, James Joseph Rodlund, and Lane Franklin Cooper, who appeared to have been arrayed on the side of Merkel when this particular dispute reached its climax. The police were called and arrived in time to control the situation before anyone was hurt. No arrests were made and no charges were filed.

From that time until July 15, 1967, when the fatal shooting occurred, there was no communication of a pleasant nature between Boyce and Merkel although they saw one another at times when Merkel would have occasion to be in the parking area which separated the garage which he rented from the Boyces' four-plex. It is evident also that the relationship between Cooper and Boyce was at least strained during the year immediately preceding the events of July 15, 1967, perhaps as a result of the July 6, 1966, argument.

Without attempting to fix the blame, one is left with the im-

pression from reading the record that there was a smoldering resentment between Merkel and Boyce as of July 15, 1967, caused principally by the insults exchanged during the arguments of the year before and fed by the silent antagonism which followed. It seems clear, also, that Cooper sympathized with Merkel in this antagonistic situation.

There were other people in the neighborhood who knew of the hostile feeling which had developed. They included Ivan C. Brooks and his wife, ThaLoyce L. Brooks, who owned an apartment building facing on Iglehart, the parking area for which was just across the alley to the north from the parking areas previously described. Robert James was one of their tenants. They also observed the events of July 15, 1967, and testified at the trial with respect to their observations.

*Preliminary Events of July 15, 1967*

The witnesses whose names have been mentioned appear agreed on the fact that the progression of events which, occurring in this background, led to the fatal shooting commenced at about 4:30 p. m. on Saturday, July 15.

Defendant Boyce came out of the four-plex and approached his car, then parked in the narrow strip separating the four-plex from the parking area on Cooper's lot. Lane Cooper and Theo Merkel, together that day since about noon, were sitting in or standing by Merkel's car. It was parked on Cooper's property near the common boundary line shared by Cooper and Boyce.

It was Boyce's intention to get into his car and drive with his 3-year-old son to a nearby house which he owned and pick up a stove located there. Merkel and Cooper had just returned from an errand in the neighborhood which involved the repair of a tire of a wheel from a bcycle belonging to one of the Cooper children. Because a blood alcohol test performed after Merkel's death disclosed a blood alcohol content of .25, it is significant that Cooper and Merkel had been drinking beer together on the Coopers' back porch earlier in the day and had visited at least two liquor establishments during the course of the errand which

preceded their return to the parking lot at about 4:30 p. m.

Merkel and Boyce became involved in an argument as Boyce was in the process of getting into his car preparatory to leaving. Bitter words were spoken on both sides. This phase of the matter ended when Cooper, with some degree of force, persuaded Merkel to withdraw and go with him across the alley to the Brooks' parking lot where the neighbors, Ivan C. Brooks and Robert James, were together.

Boyce got into his car with his son with the apparent intention of leaving. Instead, and for reasons which are in dispute, he brought his car to a stop at about the Lexington Avenue sidewalk line and went to his apartment located on the second floor of the four-plex. Boyce accounts for this by testimony that he remembered he did not have with him the key to the house from which the stove was to be taken, making it necessary for him to go back to his living quarters to get it. Cooper, on the other hand, testified that Boyce had threatened to shoot Merkel only moments before, the implication being that he stopped his car and went to his apartment to get a gun. This testimony from Cooper is sharply contested, it being Boyce's claim that the gun was kept by him customarily in the car to afford protection from risks incident to the collection of rentals which constituted a part of his real estate brokerage business. In evaluating this conflict in the inference to be drawn from the testimony, it is significant, we feel, that Boyce testified that he did not take his 3-year-old son into the apartment building with him, but instead permitted the boy to remain in the car at all times.

Boyce came back to the car within a few minutes and, getting into it, began backing up in the direction of the parking strip from which he had taken it in the first place. Boyce's explanation for this apparent change of plans: Just as he was about to drive away, his wife called to him saying that he had locked her out of the apartment where they lived. Unable to find his key to the apartment and unwilling to block the alley any longer, he decided to return the car to the parking place and leave it there until

some method could be devised which would permit his wife access to their apartment.

By fateful coincidence, Cooper was in the process of walking from the Brooks' parking area across the alley and toward his own premises as the Boyce car moved backwards. He had with him the bicycle wheel which had claimed his attention earlier in the afternoon. Boyce, in a hurry and distracted, did not see Cooper and as a result, the rear of his car brushed or struck Cooper as he was walking across the alley. Cooper brought the bicycle wheel down across the back end of Boyce's Thunderbird. Boyce, apparently unaware of what he had done, testified that he thought that Cooper was about to attack him with the wheel.

Boyce brought his car to a stop partly in the alley and partly in his parking place. He got out. The .22-caliber revolver was in his hand. At trial, Boyce claimed that he had extracted it from the glove compartment (which is located between the two front seats in this type of car), thinking that he would need it to defend himself against what appeared to him to be an unprovoked attack by Cooper. An exchange of words ensued. Both men were angry and belligerent. But, at this point, further trouble was averted by Mrs. Lane Cooper who came out on the back porch of the Cooper house announcing that she had called the police and insisting that her husband disengage himself from the quarrel.

### The Final Stage

What has been related to this point would have been the end of the affair had not Boyce shouted to Cooper as he was leaving: "And keep your goddamned kids off my back porch." Hearing this, Cooper became enraged. He returned to the fray, announcing as he did so his intent to kill or be killed. Merkel's exact whereabouts when this particular incident occurred is not entirely clear, but the inference seems inescapable that he heard what Boyce said and observed his friend's reaction to it. Although the evidence is not without conflict on this point, it also seems reasonably clear that Merkel joined forces with Cooper in an ef-

fort to overwhelm Boyce, who then struck Merkel on the left temple with the revolver.

Boyce, admitting that he had made the offensive statement concerning the Cooper children, testified that in response Cooper "came running back at me, and got about three feet away from me, right behind my car, facing me, and I was still standing under the porch, right at the left corner of my car, and says, 'You goddamned my kids, Boyce, I'm going to damn you—you're a dead man.'"

He also testified: "[Merkel] was saying, 'Why don't you put that gun down and fight like a man?' And, Cooper was just repeating, 'You're a dead man, Boyce.' * * * [T]hen I said to Cooper * * *, 'The police are coming already, but I'll give my gun to my wife and she'll cover you, and if you stay out of it I'll fight Merkel with my bare hands.' And, Cooper said, 'If you put that gun down you're a dead man.'" Then, Boyce testified: "* * * [Merkel] started circling around like he was trying to get around behind me. * * * [I]t appeared to me that he was trying to get behind me so that he could, he could jump me from behind and then Cooper could come in on me. So, I backed to the wall of the building and tried to watch them both, and then at this point Merkel said, 'Let's get him, Lane, it's a toy.' And, Lane seemed to hesitate for just a second, and then he took one step forward, and I said, 'Get back.' And, then Merkel came farther at me * * * and then I struck out at him again, and I wasn't sure whether I hit him that time or not. * * * But, after I struck out that time, then Cooper started moving forward more quickly, and I backed out onto the alley."

It is important to keep in mind that this phase of the fight was occurring immediately to the east of Boyce's four-plex on his property just to the south of the alley and that a distance of approximately 50 feet separated the northeast corner of the four-plex from the opening in the hedge near the northwest corner of the building.

Boyce started to back up the alley in a westerly direction. He

was followed by both Merkel and Cooper. As he backed away, Boyce repeatedly apologized for cursing the Cooper children without any apparent effect on either Cooper or Merkel. Then, according to Boyce: "And, we got about half-way up the alley and Cooper's wife jumped in front of him— * * * he just brushed her aside like she wasn't even there. * * * [B]eyond that point, it was just both of them stalking rapidly, I thought, after me, and I was just backing up. And, I don't remember any of the things that were being said at that point. I don't even know if there was anything being said because they were just coming, it seemed to me, faster and faster."

Boyce continued: "* * * I backed up to where the bushes were, and I backed into the opening into the bushes. * * * And, then when I backed into the front yard I thought, well, at least they'll stop when we get to the break there. And, when they came right through there I realized that they weren't going to stop for anything. * * * I was concentrating * * * primarily on Cooper; but, out of the corner of my eye I suddenly saw Merkel lunge forward, and then I heard the gun go off. * * * I heard him say, right after the gun went off * * *, 'I'm shot, I'm shot—Lane, I'm shot.' "

It is not entirely clear from the evidence precisely where Boyce, Merkel, and Cooper were at the time the fatal shot was fired. It is probable that at that time Boyce was standing in front of the four-plex approximately 15 feet south of his north property line and that Merkel was within 5 feet of him. Although there is corroboration for Cooper's testimony that he was standing in the alley when the shooting occurred, there is also persuasive testimony of a disinterested witness that Cooper was but a short distance away from Merkel when Boyce fired. When Merkel fell to the ground, he was lying about midway between the alley and the front entranceway to the four-plex. Police officers came to the scene within minutes after the shooting. Boyce was placed under restraint and taken into custody. The police officers testified that during this time he made such state-

ments as these: "Yes, I shot him * * * he was threatening me." And again: "He was coming at me so I shot him."

■ The determination of the trial court has support in the evidence. Whether this evidence should have been assessed by a jury notwithstanding defendant's request for a nonjury trial, is another matter.

■ Even though the killing was intentional, defendant should not be found guilty of manslaughter in the first degree if this taking of life was justifiable or excusable according to standards established by §§ 609.06, 609.065. In State v. Johnson, 277 Minn. 368, 373, 152 N. W. (2d) 529, 532, we said:

"It is a general rule that the legal excuse of self-defense is available only to those who act honestly and in good faith. The rule requires (1) the absence of aggression or provocation on the part of the slayer; (2) the actual and honest belief of the slayer that he was in imminent danger of death, great bodily harm, or some felony and it was necessary to take the action he did; (3) the existence of reasonable grounds for such belief; and (4) the duty of the slayer to retreat or avoid the danger if reasonably possible. 9 Dunnell, Dig. (3 ed.) § 4245; 40 C. J. S., Homicide, §§ 122 and 126; 41 C. J. S., Homicide, § 395, p. 229."

This homicide constituted a justifiable taking of life only if the evidence gives affirmative answers to these questions:

(1) At the time defendant shot Merkel, was defendant resisting or preventing an offense which he believed exposed him to great bodily harm or death?

(2) Was this belief reasonable under the circumstances?

(3) Was the intentional killing of Merkel a reasonable exertion of force under the circumstances then existing in light of the danger then to be apprehended?

Our statutes defining the conditions under which a killing may be justified or excused so as to exonerate the defendant of guilt, §§ 609.06 and 609.065, do not make the provision of § 609.20 de-

fining manslaughter in the first degree unconstitutionally ambiguous.

Two conditions must concur to transform murder into manslaughter:

(1)   The killing must have been done in the heat of passion.

(2)   The passion must have been provoked by words and acts of another such as would provoke a person of ordinary self-control under like circumstances.

At least three conditions must concur to excuse or justify homicide under §§ 609.06 and 609.065:

(1)   The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2)   The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3)   The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

A finding of intentional killing performed in the heat of passion provoked by conduct which would provoke a person of ordinary self-control under like circumstances does not preclude a finding that the killing was nevertheless done in self-defense. Whether a person who kills is guilty of first-degree manslaughter or murder depends primarily upon the state of his emotions. If he was in the "heat of passion," this would cloud his reason and weaken his will-power and therefore, in the eyes of the law, reduce the criminal culpability of the death-producing act. But, "hot blood" is not a complete excuse for the killing of another. It is an extenuating circumstance which the law considers in fixing the measure of the guilt and the consequent punishment for it. It is only when the conduct of others would provoke a person of ordinary self-control under like circumstances that the fact that the killing was done "in the heat of passion" becomes relevant even to this extent. In any event, it is the

emotional status of the defendant which is of primary importance in determining whether a homicide is murder or manslaughter in the first degree.

On the other hand, the justification or excuse which exonerates a defendant from all criminal responsibility depends, not on the state of his emotions at the time of the killing, but rather on the quality of his judgment with respect to the danger to be apprehended from others and the alternative methods by which the danger could have been avoided. Acts sufficient to incite a passion in a person having ordinary control over his emotions would not necessarily cause such a man to consider himself in danger of death or grievous bodily harm or cause a reasonable person to think it necessary to kill in order to preserve himself. It is possible for a man to kill another because of passion provoked by conduct which would fill the ordinary person with fear even though such conduct was not so threatening as to cause such a person to think reasonably that he was in danger of death or grievous bodily harm. One could be provoked to passion which would prompt him to kill without being reasonably justified in choosing this method of averting danger in preference to other available courses which would have been preferred by an ordinarily reasonable person in a like situation. To say that external circumstances could move a person having ordinary control of his emotional status to a "heat of passion" is not to say that such conduct on the part of others would cause a reasonable person to believe that death or grievous bodily harm was imminent or, if it was, that the only reasonable way to avoid the danger apprehended was to shoot the man whose words and conduct gave rise to the fear.

The acts and words which may be sufficient to make a reasonable person "deaf to the voice of reason" (State v. Hill, 20 N. C. 625, 635, 34 Am. D. 396, 400; Maher v. People, 10 Mich. 212, 81 Am. D. 781) so as to reduce a killing from murder to manslaughter need not be such as to justify a reasonable apprehension of grievous bodily harm or death and need not be so fore-

boding as to justify a resort to homicide as the only reasonable way to avert the danger to be apprehended. Voluntary manslaughter differs from homicide which is excusable because committed in self-defense in that in the former there is no necessity to kill and in the latter there is an apparent necessity to kill the aggressor for self-preservation.

The judgment which one who shoots another exercises in determining whether or not such an act is reasonably necessary for his self-preservation is one which may or may not be influenced by the state of his emotions. But, in assessing the facts which may or may not justify his decision to fire, we do so, not for the purpose of determining whether the emotions of the ordinary reasonable person would be aroused by the situation, but rather for the purpose of determining whether in such a case the ordinary reasonable person would consider killing necessary to avert the danger of death or grievous bodily harm. This turns on the character of the danger to be apprehended and the available alternatives rather than on the defendant's emotional reaction to the situation. If a reasonable person would fear death or great bodily harm under such circumstances, one of the conditions required for justification and excuse would be met whether the facts giving rise to the fear created passion or not. On the other hand, if a reasonable person would not fear death or great bodily harm in such a situation, there would be no justification or excuse for the killing even though the situation was of a kind which would enkindle the passions of the ordinary mortal. Emotional unbalance short of insanity reduces criminality but does not excuse or justify homicide.

The distinction we have made has been recognized in cases from other jurisdictions, of which People v. Best, 13 Cal. App. (2d) 606, 57 P. (2d) 168, is illustrative. In this case, the court said (13 Cal. App. [2d] 609, 57 P. [2d] 169):

" 'On the facts of the immediate case it is sometimes difficult to draw the exact line between homicide in self-defense and manslaughter. Nevertheless, the law distinguishes between the two,

and a statute stating elements of manslaughter is inapplicable to a plea of self-defense. Conversely, self-defense has no place in a definition of manslaughter or any other degree of homicide, as it excuses, rather than fixes the degree of the homicide and entitles accused to a full acquittal.' (30 C. J., p. 45.) However, the evidence and the inferences reasonably to be drawn therefrom may be sufficient to warrant the jury in concluding that, though the killing was not justifiable under a plea of self-defense, it was done under such circumstances as to reduce the offense to voluntary manslaughter. If malice is lacking and the mortal blow is struck in the heat of passion, excited by a quarrel, sudden, and of sufficient violence to amount to adequate provocation, the offense is reduced to manslaughter. (People v. Freel, 48 Cal. 436.) 'The dividing line between self-defense and this character of manslaughter seems to be the existence, as the moving force, of a reasonable founded belief of imminent peril to life or great bodily harm, as distinguished from the influence of an uncontrollable fear or terror, conceivable as *existing, but not reasonably justified* by the immediate circumstances. If the circumstances are both adequate to raise and sufficient to justify a belief in the necessity to take life in order to save oneself from such a danger, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense (Commonwealth v. McGowan, 189 Pa. 641 [42 A. 365, 69 A. S. R. 836]); while, if the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by the circumstances, *but without the presence of all the ingredients necessary to excuse the act on the ground of self defense,* the killing is manslaughter.' (Commonwealth v. Colandro, 231 Pa. 343 [80 A. 571])." (Italics supplied.)

As stated in 1 Wharton, Criminal Law and Procedure, § 214:

"To give rise to the right of self-defense, the defendant must act under a reasonable belief that he is in immediate or imminent danger of losing his life or receiving serious bodily harm. If the

defendant had any other way of avoiding the threatened harm, a killing is not justified or excused as self-defense."

In State v. Rheams, 34 Minn. 18, 24 N. W. 302, this court was called upon to consider the plea of self-defense in a situation where the defendant shot a man who had been pursuing him in a threatening way. The trial court instructed the jury as a matter of law that the evidence was legally insufficient to show a justification for the killing. In affirming, we said (34 Minn. 20, 24 N. W. 303):

"* * * We will * * * assume * * * that the defendant believed that he was threatened with great bodily harm from his assailant, and not a simple battery; and that the circumstances were such as to justify a man of ordinary fortitude in so believing. But more than this is necessary to sustain the defence of justification. In State v. Sorenson, 32 Minn. 118, it was declared that the right to kill an assailant in self-defense can only be resorted to in extremity, and when no other practicable means to avoid the threatened harm are apparent to the person assailed; and the duty was recognized, in a case such as we have assumed this to be, to escape by retreat, unless that is prevented by some impediment, or by the fierceness of the assault, rather than to take the life of the aggressor."

It is true that our present case is distinguished from Rheams in that here defendant had retreated to the front yard of his own premises whereas defendant in the cited case killed while both he and the decedent were in a public street. But this fact does not justify a determination of justification as a matter of law.

The distinction is also recognized in Miller, Criminal Law, § 92, p. 282, where the author writes:

"Manslaughter resulting from provocation must not be confounded with homicide in self-defense. In the latter the blow is excused, because necessary to save the life of the person striking it, or to prevent grievous bodily harm; while in manslaughter

there is no such necessity, and the blow is only partially excused, because given in the heat of passion."

We do not agree with appellant's claim that the statement made by the trial judge prefatory to his verdict of guilty of manslaughter in the first degree demonstrated that he failed to consider defendant's claim of innocence on the basis of justification or excuse. The statement of the trial judge that the death caused by the defendant "was not excusable or justifiable" precedes his statement that the death was caused by defendant Boyce "while in the heat of passion resulting from anger, fright and undue excitement." This order in which the remarks of the trial judge were made indicates that the absence of justification or excuse was decided before the question of whether the killing was murder or manslaughter was considered. We are satisfied that the statement of the trial judge represented his beliefs:

(1) That Boyce killed Merkel intentionally.

(2) That in doing so, Boyce acted in the heat of passion provoked by words and acts of another which would provoke a person of ordinary self-control under like circumstances.

(3) That even though the words uttered and the acts done were provocative as stated, the circumstances existing when Boyce fired were not such as to justify objectively Boyce's judgment that (a) he was then in danger of death or grievous bodily harm and (b) shooting Merkel was necessary in order to avert the apprehended danger.

The fact that the trial judge stated as a preface to his verdict that defendant Boyce was in the heat of passion resulting from anger, fright, and undue excitement does not constitute a finding that the defendant reasonably considered himself exposed to great bodily harm or death. It was reasonable for him to be fearful and apprehensive when two men were following him in a threatening way as he backed up the alley. It does not necessarily follow that their acts and threats justified reasonably the belief that he was exposed to great bodily harm or death. And

if he did reasonably believe himself to be exposed to great bodily harm or death, it does not necessarily follow that the killing of Merkel constituted the exertion of reasonable force under the circumstances. The acts and conduct of Merkel and his associate, on the basis of the record before us, could have been sufficient to create a passionate state of mind on the part of Boyce which conditioned the intent with which he killed so as to reduce its criminal quality from that requisite for murder to that justifying a finding of guilty of manslaughter even though the words and acts of the deceased and the other were not such as to cause a reasonable apprehension that it was reasonably necessary to kill Merkel in order to avoid being grievously harmed or killed himself.

■ We did not intend by our decision in State v. Spreigl, 272 Minn. 488, 139 N. W. (2d) 167, to require a "Spreigl notice" as a condition to the admissibility of evidence bearing directly on the history of the relationship existing between one accused of murder and the victim. The relevance of such evidence has long been recognized. State v. Rediker, 214 Minn. 470, 8 N. W. (2d) 527. The purpose of the warning required by State v. Spreigl, *supra,* is to prevent a defendant from being taken by surprise and required to defend against charges of criminal conduct not embraced in the indictment or information with respect to which he has entered his plea. We are certain that this defendant was aware, as he had reason to be, that his prior relationship with the decedent, particularly in so far as it involved ill will or quarrels, would be presented by the state as a part of its case against him. See, State v. Keaton, 258 Minn. 359, 104 N. W. (2d) 650, 86 A. L. R. (2d) 649. There was no element of surprise which resulted from the introduction of evidence concerning the 1966 quarrels in this case and defendant suffered no prejudice from the absence of a formal notice by the state of its intent to produce this evidence.

■ The case before us leaves us troubled because in our judgment defendant was guilty of manslaughter or he was justifiably

defending himself. We do not think any other verdict was reasonably probable upon the facts of this case, assuming, of course, a trial free of prejudicial circumstances. The evidence when fully presented raised only two questions of real significance:

(1) Was defendant's belief that he was in danger of grievous bodily harm when he fired the gun reasonable under the circumstances?

(2) Was the election to shoot rather than to continue in retreat reasonable in light of the facts disclosed by the evidence?

The trial court has made findings adverse to defendant on both of these issues. Ordinarily, in a prosecution which has been fairly tried, as the case before us was, by an impartial judge free from error, this would end the matter. Nevertheless, a reading of the entire transcript compels us to treat the case as an extraordinary one wherein the appellate court entertains such grave doubts as to defendant's guilt that the interests of justice require a new trial. State v. Johnson, 277 Minn. 368, 375, 152 N. W. (2d) 529, 533.

Defendant having been acquitted of any offense of a higher degree than manslaughter in the first degree, the decisive issues will be whether it was reasonable for defendant to believe he was in danger of grievous bodily harm and whether it was reasonable for him to fire the gun at the decedent rather than to continue to retreat.

It may be that on a retrial defendant will elect to submit the issues to a jury for decision rather than to waive his right to a jury trial as he has heretofore done. Minn. St. 631.01.

Reversed and new trial ordered.