Stanley Nathaniel KING, Appellant,

v.

STATE of Minnesota, Respondent.

No. C8–83–2013.

Court of Appeals of Minnesota.

July 3, 1984.

C. Paul Jones, Minnesota State Public Defender, Ann Remington, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Tom Foley, Ramsey County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

Considered and decided by SEDGWICK, P.J., and PARKER, and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Defendant appeals denial of his petition for post-conviction relief affecting a May 1982 conviction for manslaughter in the first degree, Minn.Stat. § 609.20 (1982). The offense included use of a weapon requiring a mandatory minimum term of imprisonment, Minn.Stat. § 609.11(4) (1982). He contends the evidence was insufficient to establish he did not act in self-defense and he asserts the trial court committed reversible error in permitting the prosecutor to ask whether he had a permit to carry a gun. He also claims the trial court abused its discretion in refusing a downward durational departure from the presumptive sentence under Minn. Sentencing Guidelines, and denying a dispositional departure by stay of the sentence.

The state maintains evidence was sufficient to sustain the conviction and contends that the question on a gun permit occurred without objection and was not prejudicial. The state claims there were no compelling circumstances requiring a departure from the presumptive sentence imposed by the trial court.

We affirm.

## FACTS

Defendant Stanley King was indicted by a grand jury on charges of second degree murder and first degree manslaughter for the shooting death of William Hall at about 9:30 a.m. on February 24, 1982. A detailed recitation of the facts is necessary for analysis of the case.

The killing occurred at the St. Paul apartment of Hall's wife, Tanu. The Halls had been separated since 1980. King visited the apartment after work, at around 2:00 or 3:00 a.m., and slept on the floor of the apartment until about an hour before the shooting.

The Halls and King had been acquainted since 1971 and became good friends about five years later. Beginning in 1973 the Halls had marital difficulties and were of-

ten separated. Hall battered his wife on several occasions.

The relationship between King and William Hall soured as King intervened for Hall's wife in marital disputes, and as a romantic relationship developed between King and Tanu Hall.

In August 1980 Hall started a fistfight with King, injuring King's face or temple so that he required surgical treatment. One witness testified that he heard Hall threaten to kill King at this time. Hall was angry because King took the three Hall children to a fair. Hall was shorter but about 35–40 pounds heavier than King.

Hall sought out King and hit him with his fists in another incident in December 1980. Later the same day Tanu Hall told King that William Hall had a gun and said he was going to shoot King. King thought he saw a weapon in Hall's pocket in the December 1980 incident, but no weapon was used in the fight. King said at that time he was not going to let Hall "beat on him any more." Tanu Hall said both men made threatening remarks shortly after the altercation. For more than six months King terminated contacts with Tanu Hall.

In the fall of 1981, after King reestablished his relationship with Tanu Hall, someone shot at him while he was driving in North Minneapolis. He suspected Hall but could not confirm his suspicions. No police report was made on the incident. In January and February 1982 King noticed on a few occasions Hall followed him.

In January 1982, because of the earlier shooting incident, King bought a Browning semi-automatic hand gun, the gun used in the fatal shooting. King was a Vietnam Marine veteran and knew how to use a gun. He carried a hand gun for several years until 1980 and once before from 1970 to 1972.

On the morning of February 24 King planned to take his car downtown. He expected to put his gun in the glove compartment and he put the clip in the gun while still in Tanu Hall's apartment at about 9:15 a.m. He said he placed the gun under a couch cushion where he often kept it. Tanu Hall thought King wore a jacket and had the gun in his jacket pocket.

The two older Hall children left for school and at 9:30 a.m. Tanu Hall left the apartment to use a neighbor's phone. The four-year old Hall boy was with King. William Hall arrived and his son let him in. There was no evidence of any report to King which would have led him to expect this visit.

King described the subsequent events. He says Hall was angry and seemed high. Hall had one hand in a jacket pocket and his son held his other hand. He shook the boy loose. King asked what was happening and says Hall responded, "You're what's happening. I'm going to kill your mother-fucking ass. Net's (Tanu Hall's nickname) pregnant ain't she?" (Indeed, Mrs. Hall was pregnant at the time.) King says he was seated on the couch and slid his hand behind the cushion to grab his gun.

King testified at trial he feared being hurt and felt that Hall intended to kill him. He says he thought Hall had a weapon in his pocket, but he didn't see a weapon.

King says he told Hall to take his hand out of his pocket and leave. He testified that Hall turned but then knocked King's arm. King dropped back. He says Hall leaned toward him and then King fired a shot. He says he aimed low but the bullet hit Hall in the stomach. King says he was on his knees at this point, that Hall kept coming toward him, and that Hall seemed to be trying to pull a weapon out of his pocket. King shot Hall three more times. One shot hit Hall in the shoulder and two struck him in the back. Hall fell and was found laying with his head away from King's position in front of the couch.

Hall was dead on arrival at St. Paul-Ramsey Hospital. Officials confirmed he had a small pocket knife in his right coat pocket, and the three-inch blade may have been open. Evidence showed the gun was at least three feet from Hall when fired. Death was likely from any one of the wounds to the stomach and the back.

The jury was given proper instructions on self-defense. Defendant King was found not guilty of second degree murder, but guilty of first degree manslaughter.

## ISSUES

1. Is the evidence sufficient to establish beyond a reasonable doubt that appellant did not act in self-defense?

2. Did the trial court commit reversible error by permitting a prosecutor to question defendant as to a permit for carrying a gun?

3. Did the trial court abuse its discretion in refusing to depart from a presumptive sentence under Minn. Sentencing Guidelines?

## ANALYSIS

### 1.

The Minnesota Supreme Court has established the standard for reviewing the sufficiency of evidence:

> In reviewing a claim of sufficiency of the evidence we must determine whether, under the facts in the record and any legitimate inferences that can be drawn from them, a jury could reasonably conclude that the defendant was guilty of the offense charged.... The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that the jury believed the state's witnesses and disbelieved any contrary evidence.

*State v. Ulvinen,* 313 N.W.2d 425, 428 (Minn.1981).

Because of his prior relationship with William Hall, defendant claims he reasonably and actually believed Hall would grievously hurt him or kill him at the time of the offense.

Minn.Stat. § 609.065 (1982) justifies the intentional taking of the life of another when "necessary in resisting or preventing an offense which the actor reasonably believes exposes him or another to great bodily harm or death...."

The elements of justification for homicide were stated in *State v. Boyce,* 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969):

> At least three conditions must occur to excuse or justify homicide under §§ 609.-06 and 609.065: (1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm. (2) The judgment of defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances. (3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

█ Once a defendant raises the issue of self-defense, the burden is on the state to prove beyond a reasonable doubt the absence of justification. *State v. Harvey,* 277 N.W.2d 344, 345 (Minn.1979).

█ There was ample evidence the jury may have accepted to conclude beyond a reasonable doubt that defendant unreasonably exaggerated his peril when deciding to shoot William Hall. Hall exhibited violent behavior and hurt defendant twice, but never with a weapon. The latest assault occurred fourteen months before the shooting. There was no compelling evidence to show the reasonableness of defendant's suspicion that Hall shot at him in Minneapolis late in 1981. The jury was the sole judge on the credibility of defendant's testimony as to words and movements of Hall before he was shot.

More compelling is the evidence of an unreasonable response of defendant. He kept a gun ready for use. His first course of action in dealing with Hall was to use his gun. He shot his victim four times, twice in the back and all four times in the victim's torso.

█ This evidence justified a jury finding that the absence of self-defense was proven beyond a reasonable doubt. The evidence supported the verdict on manslaughter and strongly suggested a more serious offense. We are not prompted by a review of the record to have "grave doubt"

as to the verdict, as defendant proposes, citing *State v. Housley*, 322 N.W.2d 746 (Minn.1982), and find instead an abiding conviction as to the propriety of the conviction.

## 2.

Defendant contends reversible error occurred when the prosecutor, during cross-examination of defendant, asked whether defendant had a permit to carry a gun in 1982.

Defendant testified about his purchase of a hand gun in January 1982, claiming it was done in self-defense. He said he registered the gun using his own name and address. On direct examination he testified about owning guns previously and having gun permits.

Cross-examination of defendant included this exchange:

Q. You carried a hand gun for how long?

A. Until about three years.

Q. As a matter of fact you had a gun permit issued to you in 1975. Is that right?

A. Yes.

Q. What kind of a gun were you carrying then?

A. 357.

Q. Have you had any other guns you were carrying around other than the Browning and 357?

A. That would be about it.

Q. You carried a gun from 1970 to 1972 in addition. Is that correct?

A. Yes.

Q. That again was a hand gun?

A. Yes.

Q. What other gun do you presently own?

A. None now.

Q. You did not have a permit to carry any kind of a gun within the corporate limits of the city of St. Paul, did you?

A. No. I wasn't carrying it.

Q. But when did you go out to your car—

A. There is a difference between carrying and transporting.

COURT: Don't argue with counsel. Just answer the question that is asked.

Q. When you go out to your car, even on this particular occasion of February 24th you would transport that weapon, that is the Browning, in the glove compartment of your car. Is that correct?

A. Yes.

Q. Not the trunk of your car?

A. No.

Q. And the gun was loaded when you would transport it in the glove compartment?

A. Yes.

Defendant's contention relates to the suggestion that he did not have a required permit for the Browning hand gun. No objection to the question occurred at trial.

In *State v. Underwood*, 281 N.W.2d 337 (Minn.1979), the Minnesota Supreme Court held questioning on a similar topic constituted reversible error. Three circumstances distinguish the present case.

First, the testimony in the *Underwood* case occurred over the objection of defense counsel. Here no objection occurred. The objection of defendant is forfeited when not stated, except on "plain errors or defects affecting substantial rights." Rule 31.02, Minn.R.Crim.P.

Second, less prejudicial error occurred here than in the *Underwood* case. Defendant did not admit the suggestion of wrongdoing. The question was not obviously accusatory. It arose as a part of extensive testimony on the purchase and registration of guns, much of it introduced by defendant. In the Underwood case, by contrast, questions on a gun permit and knowledge of statutes requiring a permit were patently aimed at maligning the defendant, and the defendant admitted a violation.

Third, the Supreme Court in the *Underwood* case stressed that it dealt there with an unusually close case, where the Court had the impression the defendant had acted in self-defense, and where "none of the (errors in the case) standing alone or aris-

ing under different factual circumstances would necessarily be sufficient to require reversal." *Id.* at 344.

■ We conclude there was no plain error in the prosecutor's question. It is unlikely the question played a substantial part in influencing the jury to convict the defendant. Reversal is thus precluded by the absence of an objection during the trial. Even with an objection, reversal would be inappropriate. The Minnesota Supreme Court said in *State v. Caron*, 300 Minn. 123, 127, 128, 218 N.W.2d 197, 200 (1974):

The test of determining whether prosecutorial misconduct was harmless depends partly upon the type of misconduct with which we are dealing. That is, the more serious the misconduct the more certain of its effect this court has felt that it should be before labeling the error harmless. Thus, in cases involving unusually serious prosecutorial misconduct this court has required certainty beyond a reasonable doubt that the misconduct was harmless before affirming.... On the other hand, in cases involving less serious prosecutorial misconduct this court has applied the test of whether the misconduct likely played a substantial part in influencing the jury to convict.

A different decision should occur, appellant argues, in a "close case" where justice requires a new trial in spite of the absence of objection to an error. *State v. Spaulding*, 296 N.W.2d 870, 878 (Minn.1980). The case here is not close, evidence being more than sufficient to justify an intentional manslaughter conviction.

3.

Defendant contends, finally, that the trial court abused its discretion in electing not to depart from the presumed sentence under Minn. Sentencing Guidelines.

Defendant was originally sentenced to an executed imprisonment of 54 months, the mandatory minimum sentence for a first time gun-related offense under Minn.Stat. § 609.11(4) (1982). The presumptive sentence for first degree manslaughter, a severity level VIII offense, with defendant's criminal history score of zero, was 43 months under the Guidelines. The presumptive sentence was imposed following 1983 Guideline amendments, effective retroactively, which reduced the mandatory minimum sentence from 54 to 36 months. See Section II.E. Minn. Sentencing Guidelines (Rev. Nov. 1, 1983), and Minn.Stat. § 244.09(11) (Supp.1983). The trial court denied both durational and dispositional departure from the 43 month sentence.

■ Where the offense involves "compelling circumstances" supporting the action, the trial court may depart from a presumptive sentence. Minn. Sentencing Guidelines, Section II.D. The trial court has "broad discretion" in refusing to depart and will be reversed only in a "rare case." *State v. Kindem*, 313 N.W.2d 6, 7 (Minn.1981).

■ Based on a showing of commendable personal adjustments, defendant seeks a dispositional departure, stay of his sentence. His claim for a durational departure is based on characterization of the offense in terms resembling his arguments on self-defense. These factors are not compelling or substantial to demonstrate the rare case requiring our reversal of the trial court sentencing decision. The trial court felt and we agree the presumptive sentence was lenient in the circumstances of the case.

**DECISION**

The evidence is sufficient to establish defendant did not act in self-defense. The cross-examination of defendant permitted by the trial court did not involve reversible error. The trial court did not abuse its discretion in refusing to depart from a presumptive sentence.

Affirmed.