STATE of Minnesota, Respondent,

v.

Scott W. ROY, Appellant.

No. C7–86–1787.

Court of Appeals of Minnesota.

June 16, 1987.

Review Denied July 22, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co.

Atty., Vernon E. Bergstrom, Chief, Appellate Section, Anne E. Peek, Asst. Co. Atty., Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Michael F. Cromett, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by LANSING, P.J., and HUSPENI and RANDALL, JJ., with oral argument waived.

## OPINION

HUSPENI, Judge.

Appellant Scott Roy was convicted of murder in the second degree, Minn.Stat. § 609.19(1) (1984), for killing his brother. On appeal he claims the trial court erred in several evidentiary rulings and that the evidence was insufficient to prove he did not act in self-defense. He also contends the trial court erred in refusing to depart downward from the presumptive guidelines sentence. We affirm.

## FACTS

On April 7, 1986, a body wrapped in a tarp and found on the grounds of Fort Snelling was identified as that of Shayne Roy. An autopsy revealed that Roy had several lacerations on his head, an injury to the nose and discolored neck muscles. The cause of death was asphyxia strangulation.

On April 8, 1986, detectives began interviewing Shayne Roy's family. They learned that Shayne had lived with his brother, appellant, and appellant's wife Tina, in a house on Victoria Street in Shoreview, a suburb of St. Paul. Appellant had subsequently moved to an apartment on Euclid Avenue in St. Paul in the middle of December 1985. Detectives went to appellant's home and informed him and Tina that Shayne's body was found in Fort Snelling and that the matter was being investigated as a homicide. Appellant said he was not surprised, and told the detectives that the last contact he had with Shayne was in early December at the Shoreview house, at which time Shayne said he had to move out and left. During the interview, the detectives asked appellant if he had told another brother, Brett Roy, that Shayne had been abducted. Appellant said he had but that he had not mentioned it further because of fear that the abductors would come after him.

Appellant told the detectives that on the Saturday after Shayne moved out of the Shoreview house, he returned and asked appellant to go with him to a garage Shayne rented on Jessamine Avenue in St. Paul. Appellant said he called another brother, Tracy Roy, to be in the area in case he needed a ride home. Appellant told the detectives that at the garage he and Shayne were confronted by two men with guns who dragged Shayne into a dark limousine and drove off.

In a written statement given at the police station later the day of the interview, appellant stated that he helped Shayne move out of the Shoreview house. Included in the move were several appliances appellant thought Shayne owned because appellant thought Shayne owned the house. According to appellant, Shayne returned the next day telling appellant he needed something out of the rental garage. Appellant then repeated the abduction story. Appellant told police he purchased Shayne's blue van for $400 a few days before Shayne left.

Appellant, when confronted with certain inconsistencies and improbabilities in his earlier statements, became angry and stated he would stand by his written statement. When it was suggested that appellant hired the two men to kill Shayne, appellant replied he could kill Shayne himself and could not afford to hire a killer.

Tina was also interviewed and affirmed that Shayne had moved out and had been abducted. She stated that appellant had bought Shayne's van for $400. Later, Tina admitted she lied about Shayne's moving out. She said when she and appellant moved out in December they moved much of Shayne's property and either kept it or threw it out in various dumpsters within the city of St. Paul.

Tracy Roy also talked to the police. Initially he said that Shayne moved out before December 7 and denied knowledge of the

abduction. He then gave the abduction story, but when it became obvious it was unbelievable, he said that appellant and Shayne had a fight at the garage on Jessamine and that Shayne had hit his head against the wall.

Appellant became angry when confronted with the inconsistencies between his statements and those of Tina and Tracy, and called them liars. When told that a search of his home revealed several credit cards and other items belonging to Shayne, appellant became nervous and retracted certain parts of his earlier statements. He was arrested for Shayne's murder and subsequently indicted by a grand jury on two counts of second degree murder.

At trial, the evidence established that appellant, age 32 at trial, began service in the Army when he was 17 and continued in the Reserves. He was trained as a licensed practical nurse, a military medic and a paramedic. Shayne, age 33, had an extensive criminal record for theft-related crimes and was considered the "black sheep" of the family. He had recently begun carrying a stun gun.

Tracy Roy testified that during the morning of December 7 he received a telephone call from Shayne asking him to come over. Shayne told Tracy that appellant was being an "asshole." When Tracy walked into the house, he heard a noise near the top of the basement stairs. He walked down, saw Shayne lying on the floor and saw appellant next to Shayne's body, crying. Shayne was fully dressed, and lay in a 12 inch pool of blood underneath his forehead. A couple of feet from the body was a screwdriver, and on a table three to five feet from the body was Shayne's stun gun.

According to Tracy, appellant said he and Shayne had an argument at the top of the stairs over Shayne's desire to move out immediately, that appellant was angry because Shayne had stolen goods which would be "left on" appellant, and when appellant threatened to turn Shayne in to authorities, Shayne lunged at appellant with the screwdriver and appellant grabbed at Shayne's throat. According to Tracy's recital, Shayne fell over the railing and

died as a result of the fall down the stairs. Appellant also told Tracy that Shayne had threatened him with the stun gun.

Tracy testified he suggested calling the police, but appellant balked at that suggestion because some of Shayne's stolen items were mixed in with appellant's property. Tracy claimed appellant retrieved a tarp and, at gunpoint, threatened Tracy into helping him roll Shayne's body in the tarp. They drove to the rental garage and placed the body inside the garage. They returned to the house and appellant told Tracy they had to clean up. Appellant washed the floor, stairwell wall and steps. He also washed his pants as well as some basement rugs.

According to Tracy, appellant began thinking of stories to tell people, finally settled on the abduction story, and again threatened Tracy at gunpoint to go along with the story. Tracy said he did not report the incident to police because he feared appellant and did not want to put his own family in danger.

Tracy further testified that a day or two after Shayne's death, appellant asked Tracy to help with a move the next week. They moved everything out of the Shoreview house on December 12–14, taking the items to the rental garage or appellant's apartment on Euclid. Tracy asked what happened to Shayne's body and appellant replied, "Don't worry about it."

When the owner of the Shoreview house threatened legal action for Shayne's failure to pay rent, appellant and Tina told the owner that Shayne was out of town. Upon entering the house on December 15, the owner found the house had been "trashed." Among the missing items were door locks, draperies, appliances, light fixtures, blinds, a portable shower and a kitchen cabinet. Paneling in the kitchen had been pulled. The owner called the police, who subsequently impounded a blue van which had been sitting in the driveway. The owner repaired and thoroughly cleaned the house, including blood splatters on the walls.

On December 17, appellant attempted to claim the van, telling the officer that Shayne had sold the van to him on Decem-

ber 12 for $300. Appellant had no proof of ownership, and his request was denied. He returned a few days later with Tina who stated she was present when appellant bought the van from Shayne. Appellant's request was again denied. Several days later appellant displayed for the sheriff's department a document stating in effect that Shayne had sold appellant the van. This also was rejected. On January 20, 1986, appellant returned with an application for transfer of title of vehicle from the Department of Motor Vehicles stamped January 14, 1986, stating that the van was bought on December 20, 1985, for $500. This was finally accepted and appellant was given the van.

According to Tracy, while towing the van, appellant told him that appellant had moved Shayne's body to someplace snowy out at Fort Snelling. Early in April 1986 appellant cleaned out the rental garage, discarded much of Shayne's property and made plans to move out of town.

In trial testimony appellant admitted killing Shayne, but claimed self-defense, stating that Shayne lunged at him with a stun gun and that appellant grabbed a nearby $2'' \times 4''$ board and hit Shayne several times. According to appellant, Shayne grabbed a screwdriver, appellant got behind Shayne, grabbed the screwdriver with one hand and held Shayne around the neck with his other elbow and arm for 30 to 40 seconds until Shayne went limp, and at that point appellant loosened his hold and Shayne fell down the stairs.

Appellant admitted wrapping Shayne's body, leaving it at the rental garage and cleaning the house. He claimed he did this alone, however, and that Tracy did not arrive at the house until he had almost finished cleaning up. He claimed Tracy helped concoct stories to cover up Shayne's death. Appellant also admitted moving the body to Fort Snelling about five days later.

Appellant was convicted of murder in the second degree and sentenced to the presumptive prison term of 120 months.

## ISSUES

1. Did the trial court abuse its discretion in admitting evidence that appellant stole and damaged property from the Shoreview house after Shayne's murder and fraudulently transferred title to Shayne's van?

2. Did the trial court abuse its discretion in excluding videotaped evidence of news reports about stun guns?

3. Was the evidence sufficient to convict appellant of second degree murder?

4. Did the trial court abuse its discretion in imposing the presumptive sentence?

## ANALYSIS

### I.

Appellant attempted to exclude evidence that in December 1985 he stole and damaged property at the Shoreview house and that in January 1986 he fraudulently transferred title to Shayne's van to himself. The trial court determined that this evidence furnished a context for the crime and was necessary to the presentation of the case because it was intimately connected with the actual murder, completing the story of the crime. The trial court stated that the evidence of the subsequent events was probative of appellant's state of mind and relevant to his self-defense theory.

Appellant contends this evidence was *Spreigl* evidence which was improperly admitted in derogation of *Spreigl* procedural safeguards.

Evidence relating to other crimes which may have been committed by the accused which is necessarily, but incidentally, part of the substantive proof of the offense, is not considered *Spreigl* evidence. *State v. Salas*, 306 N.W.2d 832, 836–37 (Minn.1981); *State v. Martin*, 293 Minn. 116, 128–29, 197 N.W.2d 219, 226–27 (1972). Evidence of appellant's efforts to destroy the crime scene was offered to complete the picture of his extensive efforts to cover up the offense. This occurred within one week of Shayne's death and effectively prevented a meaningful investigation of the scene. Appellant's efforts to obtain the van, which began 10 days after Shayne's death, were also probative of appellant's

attempt to prevent discovery of Shayne's death. The admitted evidence was probative as circumstantial evidence of appellant's consciousness of guilt, and was intimately connected with the crime. The trial court did not abuse its discretion in admitting it.

## II.

■ Appellant sought to introduce three videotaped portions of newscasts about stun guns in an effort to demonstrate the capabilities of such guns and to assist in explaining the possible impact on appellant's state of mind when he was allegedly approached by Shayne carrying a stun gun. In a pre-trial conference, appellant admitted he had not seen the particular tapes he was offering into evidence. Therefore, these tapes could not have impacted his mental process and were not probative of his state of mind. Further, the tapes were arguably more prejudicial than probative since they included scenes of police torturing a suspect, something which had no applicability to this case. In addition, appellant was unable to show that Shayne's stun gun was substantially similar to these guns shown on the videos. *See State v. Johnson*, 291 Minn. 407, 192 N.W.2d 87, 91 (1971).

Finally, we note that appellant did present testimony of a Minneapolis police officer who had conducted field research into stun guns. The jury thus had before it substantial testimony regarding stun guns and their impact on subjects. Further, defense counsel operated Shayne's gun twice during trial, and appellant and his wife both testified they had seen a news report on stun guns in which New York police officers tortured suspects into confessions. Under all of these circumstances, we conclude that the trial court did not abuse its discretion in excluding the videotape evidence.

## III.

■ Appellant argues the evidence was insufficient to show he did not act in self-defense. The criteria for use of self-defense in a homicide case is:

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*State v. Richardson*, 393 N.W.2d 657, 662 (Minn.1986) (quoting *State v. Boyce*, 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969)). Once appellant raises self-defense, the State must prove that appellant's actions were not reasonable. *Id.*

■ The jury rejected appellant's self-defense claim. On review we will not disturb that verdict if the jury could reasonably conclude that appellant was proven guilty, giving due regard to the presumption of innocence and the requirement of proof beyond a reasonable doubt. *State v. McCullum*, 289 N.W.2d 89 (Minn.1979) (quoting *State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965)). The following evidence, as cited by the State on appeal, supports the jury's verdict:

1. Appellant and Shayne were comparable in size but, while Shayne received numerous injuries, appellant was uninjured.

2. Shayne was a con man who had no convictions for assaultive or violent behavior, while appellant had spent 15 years in the military, owned a gun and, according to Tracy Roy, threatened Tracy twice with a gun to help cover up the murder.

3. Appellant and Shayne did not get along and even after the murder appellant admitted he had "no feeling" for Shayne.

4. Appellant's actions after the killing were more consistent with one covering up an intentional murder than with a person unnerved by an accidental death, in that

   (a) appellant refused to call police at Tracy's urging,

(b) appellant threatened to kill Tracy if he did not help roll the body into a tarp,

(c) appellant transported the body to a garage,

(d) appellant cleaned up the blood and other evidence from the crime scene,

(e) appellant concocted cover-up stories,

(f) appellant threatened Tracy to go along with the cover-up story,

(g) appellant moved Shayne's body to Fort Snelling,

(h) appellant moved out of the Shoreview house and took much of Shayne's property and trashed the house,

(i) appellant threw out much of Shayne's possessions in different dumpsters in St. Paul,

(j) appellant produced, what the jury could conclude were forgeries, papers to transfer title of Shayne's blue van to appellant,

(k) appellant had prepared to move out of town, and

(l) appellant repeatedly lied to the police and others about Shayne's whereabouts.

5. Appellant's trial testimony about the fight with Shayne was inconsistent with other evidence, as well as with the medical evidence.

6. Appellant's testimony that he did not know he was choking Shayne to death was not entirely believable, given the fact that appellant is a trained licensed practical nurse and a paramedic.

7. Appellant admitted he knew stun guns cannot kill or cause lasting great bodily harm and the jury could readily have concluded he used excessive force against Shayne.

Viewing the evidence in the light most favorable to the verdict, we conclude the jury's verdict was amply supported by the evidence.

## IV.

Appellant moved for a downward durational departure at sentencing. The trial court imposed the presumptive 120 month prison sentence. The appellate courts of Minnesota have often observed that the trial court is in the best position to determine if reasons exist for a departure. "The trial court has broad discretion, and * * * we generally will not interfere with the exercise of that discretion." *State v. Kindem*, 313 N.W.2d 6, 7 (Minn.1981). The *Kindem* court noted that "it would be a rare case which would warrant reversal of a refusal to depart" from a presumptive sentence. *Id.* This case presents no rare circumstances. The trial court did not abuse its discretion.

## DECISION

The trial court's evidentiary rulings were not erroneous. Evidence was sufficient to convict appellant of murder in the second degree, and the trial court did not abuse its discretion in sentencing appellant to 120 months imprisonment.

Affirmed.