**STATE of Minnesota, Respondent,**

v.

**Riley Barry HOUSLEY, III, Appellant.**

No. 51838.

Supreme Court of Minnesota.

Aug. 13, 1982.

Bloedel, Nelson, Slade, Volstad & Hawkinson, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas Johnson, County Atty., Vernon E. Bergstrom, Thomas A. Weist, Michael McGlennen, Asst. County Attys., and Anne E. Peek, Staff Atty., Minneapolis, for respondent.

TODD, Justice.

The criminal prosecution arises out of a shooting incident that took place during the afternoon of December 13, 1979 at the home of the defendant, Riley B. Housley. Housley shot two plain-clothes Minneapolis police officers, Sergeants David Mack and Robert Skomra, after the officers had gained entry to Housley's home in an attempt to execute a search warrant. Defendant Housley was charged with two counts of attempted murder, two counts of

assault in the first degree and one count of assault in the second degree. The defendant admitted at trial that he shot at officer Mack, but claimed he acted under the mistaken but reasonable belief that his home was being burglarized and that the shooting was therefore justified as self-defense. On June 3, 1980 a Hennepin County District Court jury found the defendant guilty of assault in the first degree with regard to the shooting of Sergeant Mack; Housley was acquitted on all other charges. The primary issue on appeal is whether there is sufficient evidence to support the defendant's conviction. More specifically, Housley argues the state failed to prove that his use of force was not privileged. After a thorough review of the record and careful consideration of oral arguments presented to this court, we are drawn to the conclusion that the prosecution failed to prove beyond every reasonable doubt that defendant Housley was not acting in his own self-defense when he shot at Sergeant Mack. Accordingly, we reverse.

### The Police Activity

In late 1979 Minneapolis police arrested a juvenile who later indicated that he had sold a Kalimar camera for $20.00, along with some stereo equipment, to a person named Riley Housley. The police, who were in the course of investigating several burglaries, obtained a warrant to search the defendant's home at 2807 Pillsbury Avenue South, Minneapolis. The warrant directed the police to seize "one Kalimar camera, stereo equipment and accessories, [and] papers and documents which show control and occupancy of the premises searched."

On December 13, 1979, the police gathered at the Sixth Precinct, forming a task force to serve three separate warrants. The evidence indicates that it was department policy that a uniformed officer always accompany the police in the execution of a search warrant. However, because of shift changes occurring about this time, no uniformed officers were available so eight plain-clothes officers drove to the defendant's home in four vehicles. All the police cars were unmarked. Prior to departure, the police ran a check on Housley and found that he had no criminal record.

The first officers to arrive at the scene were Sergeant Robert Skomra and his partner, Sergeant Grates. It was a sunny December afternoon, but all the shades in the Housley residence were drawn. Skomra and Grates went to the front door and both officers rang the doorbell and knocked. The doorbell was of the type that operated only in the door and was not electronically connected to a ringing device within the home. Sergeant Grates also kicked the bottom of the door, but the officers received no response. The officers heard a phone ring inside the home but did not hear anyone answer. Skomra and Grates were at the front door for approximately three minutes.

Sergeants Skomra and Grates then walked to the north side of the house where a rear door was located. There they were joined by Sergeants Mack, Murphy and Larson. Sergeant Mack was wearing a ski jacket, a plaid shirt, Levis and hiking boots, had a mustache and a full beard, stood between 6'2" and 6'3" and weighed 220 to 225 pounds. Sergeant Skomra described Sergeant Mack as a "big man."

After checking windows and upon concluding that no one was at home, the officers decided to execute the warrant by entering the house through the rear door. Sergeant Skomra pulled on the rear door's outside aluminum and glass storm door, but found it locked. Sergeant Mack broke the glass in the aluminum storm door and unlocked it. Mack then broke the glass in the inside wooden door and yelled through the broken glass, "we are the police with a search warrant." There are conflicting claims that other officers yelled similar statements during the next few minutes as further events unfolded, but it was conceded by the state at oral argument that, for the purposes of this case, Riley Housley, who was in the house, did not hear any of these statements and thus they are immaterial. When Mack broke the glass in the inner wooden door, the window shade on the door flipped up, casting light into the kitchen area. The rest of the inside of the

house was very dark because the shades were drawn.

Sergeant Mack reached through the broken glass in the inner door and attempted to unlock it, but could not. The door was secured by a double-deadbolt lock. Sergeant Mack kicked the door a couple of times, but to no avail. Sergeant Berneck then suggested that a sledge hammer be used to break the door in. Sergeant Berneck retrieved a sledge from his car and went to work on the wooden door. Breaking the door with the sledge took from 2 to 5 minutes. Sergeant Grates testified that Berneck struck the door with the 12 pound sledge 3 or 4 times. Sergeant Berneck testified that he struck the door 7 times. Once the locking mechanism was disengaged, Berneck kicked the door in and the police officers began to enter the house. The officers had been at the scene for approximately 15 minutes before gaining entry to the house.

The first officer to enter the house was Sergeant Mack. Sergeant Berneck entered behind Mack, but stopped to remove a television stand and other clutter which were stacked behind the door and which prevented the door from opening all the way. Sergeant Skomra followed Sergeant Mack into the house. Behind Sergeant Skomra was Sergeant Grates. Sergeant Skomra testified that just as he was about to enter the kitchen area (behind Sergeant Mack) he heard a rapid sequence of shots and felt something strike him in the side. Sergeant Mack was also shot as he was just about to cross the threshold between the kitchen and the dining room. Mack fell in the kitchen. Sergeant Grates quickly helped Sergeant Skomra out of the house. Sergeants Baltzer and Berneck, who had been removing clutter from behind the door, hit the floor when the shooting started. There was a period of silence following the shots. Baltzer and Berneck then overheard defendant Housley as he made a telephone call. The officers heard the defendant say, "Get the police, I just shot someone." Sergeant Berneck immediately responded, "We are the police, drop your gun." Defendant Housley responded, "If you are the police, let me see your badge." Sergeant Baltzer held his badge up, but the defendant yelled, "Hold it up higher, I can't see it." Baltzer held the badge higher and the defendant shouted, "Throw it to me." Baltzer threw the badge in the direction of the defendant's voice. Baltzer shouted again, "drop your gun, we are the police." Riley Housley dropped his gun and was placed under arrest.

### Housley's Actions

Riley Housley took the stand on his own behalf. He was 23 years old at the time of the shooting incident. Housley was a high school graduate and a construction worker. He stood 6'3" tall, weighed 165 pounds, and was extremely nearsighted. His uncorrected vision in his right eye was 20–400 and his left eye tested at 20–300. Housley had lived at 2807 Pillsbury with his fiancee, Denise Nelson, since April of 1979. Housley had no criminal record.

Housley testified that before moving to 2807 Pillsbury he lived on 3rd Avenue South, Minneapolis. He stated that his residence there was burglarized in April of 1979 at 2:30 in the afternoon. Stereo equipment and money were stolen, and the theft was reported to the police. Housley and Denise Nelson then moved to 2807 Pillsbury. The defendant testified he was robbed and beaten in his home on Pillsbury in July of 1979. Housley testified that a man burst through the door and struck him in the head with a crowbar. Another man appeared in the doorway and yelled, "Cops!" Riley Housley, Denise Nelson and a friend were then robbed while the man who had appeared in the doorway pointed a shotgun at them. The prosecution stipulated that on July 18, 1979, at five minutes after midnight, a report was received by the Minneapolis Police Department indicating a robbery of a dwelling at 2807 Pillsbury Avenue South, the victim listed as Riley B. Housley, III. Housley testified that this incident caused him to become extremely frightened and concerned. In addition to adding security locks to the premises, the day after the July 1979 robbery he went with Denise Nelson to pur-

chase a handgun. At that time he was advised as to the registration procedures to be followed in purchasing a handgun, and he followed these procedures. He also discussed with the salesperson the type of weapon he wanted and decided to purchase a .32 caliber pistol which he believed to be less damaging than a .45, a .38, or a .22 caliber pistol. His purpose was to acquire a gun that would stop somebody, but not necessarily kill them. At that time Denise Nelson bought a .22 rifle so that they could have immediate protection. About 10 days later the permit was secured from the police department and Housley took possession of a .32 caliber handgun. Housley had never had guns in his home before the July 1979 robbery. He and Denise subsequently took target practice with the handgun and Housley became familiar with its operation. The gun was usually kept in the bedroom.

Housley testified that during the early morning hours of December 13, 1979, the day of the shooting, he was drinking beer at a friend's home. Housley did not get home until 6 a. m. He stripped to his underwear and a T-shirt and then fell asleep on the couch in the living room with one of the pillows over his head. Denise Nelson arose at about 12:30 and took the dog, which belonged to the parties, and went to her mother's house to help clean. Before leaving she shook Housley and informed him of the fact that she was going. She testified that Housley is an extremely sound sleeper and that it requires great effort to arouse him when he is asleep. Defendant testified that he was later awakened by a thud or a crash which sounded as if it came from the kitchen. He testified that he then heard the sound of glass being "crunched" in the kitchen. Housley stated that he was "terrified", thinking that someone had broken into the house and that he was being robbed again. Housley never used the back door of the house, nor did his housemate, Ms. Nelson. Housley testified that he could not find his glasses in the area of the couch, but discovered his handgun in the back of a cushion, where it was kept from time to time. Housley testified that he stood up, cocked the automatic pistol, and looked through the dining room at the doorway to the kitchen. There he saw a "large bushy figure kind of partially silhouetted in the light just about to enter the dining room," some 15 to 20 feet away. Housley testified that the man, who "filled the doorway", appeared to have a gun in his hand, and started to make a jerking motion with his left hand. Housley testified that he thought the intruder was about to fire upon him so he just "shot toward him." Housley denied seeing anyone else present in the kitchen. Housley thought he fired two or three shots. Sergeant Ronald Adler testified that an automatic weapon such as that used by the defendant could fire four or five rounds "in a second or so." When Housley saw the figure in the doorway fall to his knees he picked up the phone in the dining room and ran into the bathroom. There he called the Minneapolis Police Department for help.

Housley was arrested in his underwear and a T-shirt. He was not wearing shoes or socks. He was not wearing his glasses. In an interview that afternoon, Housley freely volunteered all information concerning the incident. Sergeant Adler testified that Housley was "very cooperative." Housley's account of the incident, which he gave to Sergeant Adler after his arrest, was identical to the account he gave at trial.

**Subsequent Events**

After Housley surrendered it was determined that Sergeant Mack had sustained three wounds, one in his left hand, one in his abdomen and one in his neck. Sergeant Skomra had received a wound in the abdomen. Ambulances were called, a number of police and paramedic people entered the home, quite a bit of the furniture was moved about and the police remained on the premises until 11:00 that night. Considerable searching of the premises was done and quite a bit of damage to the contents ensued, making it difficult to determine from the various pictures what the actual placement of furniture was at the time of the shooting. Sergeant Skomra recovered from his wound. Sergeant Mack suffers a severe paralysis as a result of his neck wound and

was unable to testify at trial. The matter was brought on for trial. Housley admitted the shooting but claimed he was entitled to defend his home under Minn.Stat. § 609.06 (1980) and that the shooting was justified as self-defense. The jury returned a verdict of not guilty verdict on all counts except the charge of first degree assault against Sergeant Mack. Housley made a motion for a judgment of acquittal on the grounds that the verdict was inconsistent, that the state had failed to prove beyond a reasonable doubt that he was not entitled to defend himself and that the trial court had erroneously instructed the jury on the elements of self-defense. These motions were denied.

### Issue

The principal issue in this case is whether the state proved beyond a reasonable doubt that Riley Housley was not entitled to defend himself on December 13, 1979 at the time the police broke into his home for the purposes of executing a lawful search warrant.

### Discussion

An individual's substantive right to act in self-defense is codified in Minn.Stat. § 609.06 (1980) and Minn.Stat. § 609.065 (1980). Section 609.06 provides, in pertinent part:

Reasonable force may be used upon or toward the person of another without his consent when the following circumstances exist or the actor reasonably believes them to exist:

\* \* \* \* \* \*

(3) When used by any person in resisting or aiding another to resist an offense against the person;

Section 609.065, entitled "justifiable taking of life," provides that one may intentionally take the life of another

when necessary in resisting or preventing an offense which the actor reasonably believes exposes him or another to great bodily harm or death, or preventing the commission of a felony in his place of abode.

While section 609.065 is result-oriented, in the sense that it speaks of the justified *taking of a life*, it follows that the use of a deadly weapon and the infliction of great bodily harm would be justified under section 609.06 in every instance where section 609.065 authorizes an intentional killing.

In *State v. Boyce*, 284 Minn. 242, 170 N.W.2d 104 (1969), we held that three conditions must concur to excuse or justify the use of deadly force under sections 609.06 and 609.065:

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*Id.* at 254, 170 N.W.2d at 112. The burden of proof is upon the state to prove beyond a reasonable doubt that the defendant's use of force was not justified. *State v. Spaulding*, 296 N.W.2d 870 (Minn.1980); *State v. Schluter*, 281 N.W.2d 174 (Minn.1979); *State v. Harvey*, 277 N.W.2d 344 (Minn. 1979).

This case is extremely tragic. Sergeant Mack has sustained horrendous injuries. Riley Housley is faced with a felony conviction. It serves little purpose to second-guess the conduct of either the police or Riley Housley. The state does not dispute the fact that defendant Housley was extremely frightened when he shot at Sergeant Mack. Our inquiry is therefore limited to the question of whether the state proved defendant's fear of imminent bodily harm or death was unreasonable under the circumstances. The state conceded during oral argument that Housley did not hear the warnings given by police. In light of defendant Housley's telephone call for help to the Minneapolis Police Department, the state also concedes that the evidence *does not* support a reasonable inference that Riley Housley actually knew he was shooting at a police officer.

The defendant was awakened by the sound of a thud or a crash and then heard someone walking on broken glass in his kitchen. There had been a violent entry into his home through a door that was securely locked and never used. The house was dark except for the light entering the kitchen area through the broken door. The defendant had been beaten and robbed at gunpoint, in the same house, only six months before. Housley, who is extremely nearsighted, could not find his glasses, but located his gun. Seconds later he was confronted by the silhouette of an unknown man standing 6'3" and weighing between 220 and 225 pounds. Housley testified that the intruder appeared to have a gun in his left hand and made a jerking motion. Housley testified that he thought he was about to be fired upon, so he fired several shots in rapid succession and then grabbed the telephone and ran into his bathroom to call the police. The state posits several actions which, in retrospect, Housley should have taken when confronted by the unknown intruder in his home. Our primary concern, however, is not with what Housley might have done, but with the reasonableness of what he did do. Our statutes authorize the use of deadly force when the defendant reasonably believes he is in imminent danger of serious bodily harm or death. In light of the testimony in this case, we find the prosecution failed to prove beyond a reasonable doubt that defendant Housley's concern for his safety was unreasonable.

As we stated in *State v. Boyce*, ordinarily when a prosecution has been fairly tried, we will not reverse. Nevertheless, a review of the entire record compels us to treat this case as an extraordinary one; we entertain such grave doubt as to defendant's guilt that, in the interest of justice, we must enter a verdict of not guilty on the charge of assault in the first degree.

Reversed.

SCOTT, Justice (dissenting).

I respectfully dissent. In my opinion the reasonableness of the appellant's actions is a jury question. Therefore, viewing the evidence in the manner most favorable to the guilty verdict, the jury's verdict is not manifestly contrary to the evidence presented at trial and consequently should not be overturned.

In its instruction to the jury the trial court gave three criteria against which Riley Housley's conduct should be evaluated:

First, the killing must have been done in the belief that it was necessary to avert death or great bodily harm.

Second, the judgment of defendant as to the gravity of the peril to which he was exposed must have been reasonable, not in the clear light of calm consideration, but under the circumstances as they existed at the time of the event.

*Third, defendant's election to defend himself must have been such as a reasonable man would have made in light of the danger to be apprehended and the existence of any alternative way of avoiding the peril.*

(Emphasis added.) The instruction correctly restates our law on self-defense as it was set out in *State v. Boyce*, 284 Minn. 242, 170 N.W.2d 104 (1969). The jury was required to apply the law of self-defense to the facts it found at trial.

It is not our function on appeal to give de novo review of the facts. As we have said:

[I]n reviewing the sufficiency of the evidence we do not try the facts anew. Our responsibility extends no further than to make a painstaking review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt is sufficient to permit the jury to reach that conclusion.

*State v. Ellingson*, 283 Minn. 208, 211, 167 N.W.2d 55, 57 (1969). Convictions challenged on the sufficiency of the evidence will be reversed only where the verdict is manifestly contrary to the evidence introduced at trial. *See State v. Strimling*, 265 N.W.2d 423 (Minn.1978); *State v. Reichenberger*, 289 Minn. 75, 182 N.W.2d 692 (1970).

The appellant would have us view the evidence in a manner most favorable to a finding of not guilty, which is precisely the opposite of what we are required to do. The respondent correctly notes that, on review, this court must assume that the jury believed the state's witnesses and disbelieved those for the defense. *See, State v. Marsyla,* 269 N.W.2d 2 (Minn.1978); *State v. Hill,* 312 Minn. 514, 253 N.W.2d 378 (1977); *State v. Olsen,* 258 N.W.2d 898 (Minn.1977). There was considerable evidence presented at trial from which the jury might have concluded that the appellant's actions were unreasonable under the circumstances. The state suggested a number of alternatives available to the appellant short of shooting Sergeant Mack. The majority dismisses these alternatives by saying that we are primarily concerned with the reasonableness of what the appellant did do, and not with what he might have done. However, the law of the case specifically required the jury to be concerned with "the existence of any alternative way of avoiding the peril," *see* instruction, *supra.*

My reading of the record indicates that the jury could have viewed the evidence as follows: The appellant was awakened quite early in the process of the officers' efforts to gain entry. He then heard the officers shout, "We are the police with a search warrant." The appellant then heard breaking glass followed by several minutes of sledge hammering at his door. After the police gained entry, he heard another officer, Sergeant Berneck, yell again, "Police, search warrant." Finally, the appellant, though myopic, had sufficient visual acuity to determine that the person he saw in the doorway was neither holding a gun nor raising a gun in a threatening manner.

Evidence was presented to support the above scenario, and I reiterate that it is our obligation to view the evidence most favorably to the finding of guilt. The jury had sufficient evidence before it to infer that the appellant should have done before the shooting that which he did immediately after; i.e., retreat to a point of safety, call the police and ask to see the officers' badges.

If the jury believed that the sound of breaking glass and sledge hammering awakened the appellant before he said he was awakened, ample opportunity existed for avoiding the peril by shouting, "Who is there?" or "Stop—I have a gun." These are all reasonable inferences that the law of self-defense requires juries to consider when it evaluates reasonableness in light of the existence of any alternative means of avoiding the peril.

In conclusion, I cannot agree with the majority's decision to hold, as a matter of law, that the appellant's decision to shoot first and ask questions later was reasonable. The obligation to choose reasonable alternatives to avoid peril where such alternatives are available is an integral part of the law of self-defense. This court has neither seen nor heard the witnesses in this case. We should not invade the province of the jury by taking the question of the reasonableness of the appellant's conduct from their consideration. I would affirm.

AMDAHL, Chief Justice (dissenting).

I join in the dissent of Justice Scott.

KELLEY, Justice (dissenting).

I join in the dissent of Justice Scott.