STATE of Minnesota, Respondent,

v.

Victor David SANFORD, Appellant.

No. C6–89–791.

Court of Appeals of Minnesota.

Jan. 16, 1990.

Review Granted March 22, 1990.

582

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Minn., Thomas L. Johnson, Hennepin County Atty., Beverly J. Wolfe, Asst. County Atty., Minneapolis, Minn., for respondent.

Joseph S. Friedberg, Minneapolis, Minn., for appellant.

Heard, considered and decided by KLAPHAKE, P.J., and PARKER and FOLEY, JJ.

## OPINION

PARKER, Judge.

Victor David Sanford appeals his conviction on three counts of second degree murder and one count of attempted first degree manslaughter. He claims insufficiency of the evidence proving intent, that the trial court erred in refusing his requested instructions on self-defense and manslaughter, that the trial court abused its discretion and violated his constitutional right when it ordered a bifurcated proceeding to hear his insanity defense, that errors in the grand jury proceedings prejudiced his trial, and that the trial court abused its discretion in denying his motion for a downward adjustment in sentencing and in ordering consecutive sentences. We affirm.

## FACTS

In March 1988 Victor Sanford was introduced to Charmine Deschl and Michael Rodaker, who were involved in selling drugs. The next month, Deschl and Rodaker began renting a room from Sanford. Sanford's mother, the owner of Sanford's triplex, ordered Deschl and Rodaker to vacate the premises by May 11, just 30 days after they had moved in. They did not do so.

On May 12 Sanford had the locks changed. He saw Deschl and Rodaker early in the morning of May 13 and told them his mother, not he, had changed the locks. He talked to them again around 5 a.m. and told them their belongings had been moved from their rented room.

About 7 a.m. Deschl, Rodaker and George Linehan knocked on Sanford's door and yelled from the side of the tri-plex. The three went into the garage and noticed that some of Deschl's belongings had been put into Sanford's car. Sanford eventually woke up, came down the stairs and let them in. The three rushed past him up the stairway and Sanford followed. The tenants below testified that a heated argument began immediately. They heard loud thudding noises "like heavy objects being pounded on the floor." There were screams, calls for help and a "pop" sound. They heard Linehan run down the back stairs, calling for help.

There is some dispute as to what happened in the apartment. Sanford claims the three attacked him and that Linehan hit him in the back of the head. Police, however, were unable to find any visible signs of injury to him. He shot Linehan in the face with a .22 rifle. He stabbed Rodaker six times and then shot him in the back of the head at close range with a .41 magnum pistol, causing instantaneous death.

Sanford stabbed Deschl a total of 19 times. She also suffered a severe blow to her forehead that fractured her skull. Expert testimony established that this injury was caused by a moving object impacting Deschl's stationary head and could have been caused by the butt of the .22 rifle. The stock of this rifle broke sometime during this fight. Neighbors testified that they heard Deschl repeatedly cry out, "Oh my God, help me, oh, my God, help me, someone help me, oh my God."

After the killings, Sanford told a neighbor to call the police. He then walked outside and waited. When the police arrived, Sanford said to them, "Thank God you're here. I had to shoot them." He led them to Linehan, who identified Sanford as the one who had shot him. Sanford told the police that he had to shoot Linehan because "they were assaulting me." He was arrested and taken to the station, where he willingly gave a statement. He told of his discharge from the service and his collection of firearms and described the incident.

A blood test showed that Sanford had a blood alcohol content of .12 that morning. A toxicological examination of Rodaker's and Deschl's urine revealed the presence of several other drugs and suggested that they had ingested cocaine shortly before their deaths. An autopsy showed that Deschl was four to six weeks pregnant when she was killed and that the fetus was not viable.

Sanford normally kept his firearms unloaded and in his bedroom closet. On the morning in question, however, he had a loaded shotgun on his bed, a loaded .22 rifle against the wall, a second loaded .22 rifle behind his bedroom door, and Rodaker's loaded .41 magnum revolver which Sanford had taken earlier that day from Rodaker's room.

A friend of Rodaker testified that one month before the killings, Sanford told him his beliefs about self-defense. Sanford, who worked as a delivery person, stated that he made sure he did not enter anyone's home because they could then kill him in self-defense. He told Rodaker's friend that if you ever want to kill somebody, get them into your house and then it will automatically be self-defense.

Sanford claims he was extremely afraid of Rodaker and Deschl. Several weeks before Sanford killed him, Rodaker had pointed his .41 magnum revolver at Sanford and said he was going to kill him. Deschl owned and often carried a .25 automatic pistol which Sanford had sold her.

The three victims were unarmed when they went to Sanford's apartment. Sanford knew that Rodaker did not have his .41 magnum revolver that morning. He admitted that he did not see any of the victims with a weapon at his home that morning.

Sanford was indicted by the Hennepin County grand jury for three counts of first degree murder of two people and a fetus and one count of attempted murder in the first degree. Sanford and other defendants indicted by this grand jury filed motions to have their indictments dismissed because of certain errors which occurred during the grand jury proceedings. A district court panel denied the motions. In *State v. Johnson*, 441 N.W.2d 460, 466 (Minn.1989), the supreme court reversed and ruled that certain actions of the Hennepin County Attorney had tainted the grand jury proceedings and prejudiced the substantial rights of the defendants. Sanford did not join the appeal; his case went to trial before its conclusion.

Sanford pled not guilty, claiming self-defense and not guilty because of mental illness; the court ordered a bifurcated trial over Sanford's objection. In the second half of the trial, Sanford presented expert testimony that he suffered from a paranoid personality disorder. The state's expert found no mental illness, discounted the defense diagnosis, but conceded that the diagnosis of paranoid personality disorder was arguably correct. The jury found that Sanford was not criminally insane on the morning of the crime. He received a total aggregate sentence of 468 months in prison.

## ISSUES

1. Was the evidence sufficient to sustain the jury's conclusion that Sanford had not acted in self-defense and had acted with the intent required to commit second degree murder?

2. Was it proper for the court to reject Sanford's request that the jury be instructed to evaluate the evidence of self-defense according to the defendant's subjective belief of its need?

3. Did the trial court abuse its discretion in refusing to adjust Sanford's presumptively consecutive sentences downward?

4. Was Sanford denied due process by the court's refusal of his request that his insanity defense be a part of a single trial?

5. Did errors in the grand jury proceeding cause prejudice to Sanford which would necessitate a new trial?

## DISCUSSION

### I

■ In reviewing the sufficiency of the evidence, this court must determine "whether the jury could reasonably have found the defendant guilty viewing the evidence in the light most favorable to the verdict." *State v. Daniels*, 332 N.W.2d 172, 180 (Minn.1983). This court must assume the jury did not believe testimony which contradicts its finding. *State v. Strimling*, 265 N.W.2d 423, 428–29 (Minn. 1978).

## A. Self-Defense

The following conditions must exist to justify the use of deadly force in self-defense under Minn.Stat. §§ 609.06 and 609.065 (1988):

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

State v. Boyce, 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969), quoted in State v. Buchanan, 431 N.W.2d 542, 548 (Minn. 1988). Once a defendant claims self-defense, the state must prove beyond a reasonable doubt that the killing was not justifiable. State v. Austin, 332 N.W.2d 21, 23 (Minn.1983). The state may do this by proving the nonexistence of any of the Boyce elements. Buchanan, 431 N.W.2d at 548. The prosecutor showed a lack of the second and third elements described in Boyce.

[4] The jury could reasonably have concluded that Sanford's judgment of the gravity of the peril he faced was unreasonable. Sanford admits that he did not see any of the three holding a weapon. Although Rodaker had threatened to kill him several weeks before, Sanford had Rodaker's revolver and therefore knew he was unarmed that morning. Two of the victims were substantially smaller than Sanford. He claims, however, that the three attacked him in unison. The surviving witness denied this and there was no evidence that Sanford had been physically injured. Although the three had taken cocaine and were angry, the jury was in the best position to weigh this circumstantial evidence. State v. Anderson, 379 N.W.2d 70, 78 (Minn.1985).

A jury can reasonably conclude that elements two and three do not exist when the defendant continues to use force after a time the attacker poses any danger.

Buchanan, 431 N.W.2d at 548. Sanford stabbed Rodaker six times and subsequently shot him in the back of the head. Witnesses heard Deschl screaming for help. Sanford continued to stab her a total of 19 times and fractured her skull, apparently with the butt of a rifle. The jury could reasonably find ·that even if force were initially necessary, Sanford delivered deadly blows after any force was needed to avert any danger to himself.

Sanford testified that he always considered the victims to be dangerous. He knew the victims were angry and would be angrier when they saw that he had broken into their room and moved their belongings. The jury could have concluded that a reasonable person would not have let the three into his home and followed them upstairs and that a reasonable person would have retreated from a situation in which he feared danger. See State v. Richardson, 393 N.W.2d 657, 662 (Minn. 1986).

## B. Intent to Kill

Intent is a subjective element which must be inferred from all the circumstances of the act. See State v. Whalberg, 296 N.W.2d 408, 415 (Minn.1980). The element of intent in second degree murder is satisfied by showing that when the defendant killed the victim he acted with intent to effect the death of the victim. Minn. Stat. § 609.19, subd. 1 (1988). "With intent to" means "the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." Minn.Stat. § 609.02, subd. 9(4) (1988).

Sanford's acts of stabbing and then shooting one of the victims and repeatedly stabbing and then delivering a blow to the head of the other victim after repeatedly stabbing her justified the jury's finding that he acted with intent to kill them. See, e.g., State v. Salas, 306 N.W.2d 832, 837–38 (Minn.1981); State v. Bryant, 281 N.W.2d 712, 714 (Minn.1979). Like Sanford, the defendant in Salas claimed he was fearful because the victim had threat-

ened him in the past. In holding that the jury in *Salas* had sufficient evidence to find intent to kill and rule out manslaughter, the Minnesota Supreme Court stated:

> The mere fact of prior threats from the deceased, and the fact that the deceased reached into his shirt shortly before the shooting, do not compel a verdict of manslaughter instead of second-degree murder. The provocation defense wanes even further in view of the evidence that defendant fired a second shot into [the victim's] head, then started kicking him and even after that, continued to beat his victim with a board.

*Salas*, 306 N.W.2d at 838.

### C. *Intoxication*

The fact of intoxication may be taken into consideration when determining intent. Minn.Stat. § 609.075 (1988). The possibility of intoxication does not create a presumption that the person is incapable of intending to commit murder. *Whalberg*, 296 N.W.2d at 418. A blood alcohol content of .12 is not proof of intoxication; it is a measurement used to regulate safe driving.

Although Sanford had such a blood alcohol content, his actions after the crime are inconsistent with his intoxication claim. He told a neighbor to call the police. When the police arrived he walked up to them and stated that he had to kill the victims. He then took an officer to Linehan, who had gone into a neighbor's home. If the record contains sufficient evidence to support the jury's conclusion on the issue of intoxication, this court may not reverse the conclusion even though there is some evidence to the contrary. *Id.* at 416.

### D. *Manslaughter—Heat of Passion*

Sanford contends that because the jury found him guilty of the lesser offense of attempted first degree manslaughter in shooting Linehan, it is compelled to find only manslaughter for the killing of Rodaker and Deschl which was part of the same incident, occurring within minutes of the first shot.

Minn.Stat. § 609.20 (1988) provides:

Whoever does any of the following is guilty of manslaughter in the first degree * * *:

(1) Intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self control under like circumstances * * *;

Sanford shot Linehan once and did not further injure him, whereas he repeatedly stabbed the others and "finished them off" cold-bloodedly with a shot to the back of Rodaker's head and a rifle butt to Deschl's head. The evidence is therefore sufficient to support the jury's distinctions in the convictions. The apparent "coup de grace" injuries inflicted on both Deschl and Rodaker provide a factual basis for such distinctions.

## II

It is within the discretion of the trial court to refuse to give a requested instruction. *State v. Daniels*, 361 N.W.2d 819, 831 (Minn.1985). An instruction need not be given if it is not warranted by either the facts or the relevant law. *See State v. Ruud*, 259 N.W.2d 567, 578–79 (Minn.1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978). On appeal, this court considers the trial court's instructions as a whole. *Id.*

The trial court did not abuse its discretion when it rejected the following instructions requested by Sanford:

> Number 3. In order for a killing to be justified, the defendant must have acted honestly and in good faith, with a sincere belief that his actions were necessary to avert death or great bodily harm to himself, or to prevent the commission of a felony. The state has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense;
>
> Number 4. To determine whether the defendant acted honestly and in good faith, you must evaluate the facts from the defendant's point of view. That is, you must evaluate what facts were ap-

parent to defendant when he acted, and how he perceived them;

Number 5. If you find that the defendant acted sincerely and in good faith, but that his belief was unreasonable, you must find him guilty only of manslaughter in the first or second degrees.

Sanford concedes that the self-defense instructions given by the trial court tracked the applicable statute, Minn.Stat. § 609.065, and have been repeated in case law. The trial court's instructions are consistent with CRIM JIG 7.05, which was approved by the supreme court in *State v. Schluter*, 281 N.W.2d 174, 177 (Minn.1979).

Sanford argues, however, that his requested instructions 3 and 4 are consistent with *State v. Housley*, 322 N.W.2d 746 (Minn.1982). He claims that the court applied a subjective standard in *Housley*, resting its decision on the defendant's subjective state of mind.

Sanford's argument is without merit. The *Housley* court reiterated the objective requirements in *Boyce*, that the defendant's judgment of "the gravity of the peril to which he was exposed must have been *reasonable* under the circumstances" and that the "defendant's election to kill must have been such as a *reasonable man* would have made in light of the danger to be apprehended." *Id.* at 750 (emphasis added). The supreme court considered factual circumstances which were peculiar to Housley and applied a reasonable person standard, i.e., whether a reasonable person would have believed he needed to use deadly force under the circumstances as they were presented to the defendant, including the defendant's physical limitations and certain facts from his past history. *See id.* at 751. The *Housley* court did not discard the objective standard.

▮ The trial court did not abuse its discretion in refusing to give Sanford's requested instruction number 5. This is an "imperfect self-defense" instruction. *See People v. Flannel*, 25 Cal.3d 668, 677, 160 Cal.Rptr. 84, 88, 603 P.2d 1, 5 (1979). The Minnesota Supreme Court has refused to adopt this "new defense" from *Flannel*. *State v. Buchanan*, 431 N.W.2d 542, 549 n.

1 (Minn.1988). This court affirmed a trial court's rejection of an imperfect self-defense instruction in *State v. Hennum*, 428 N.W.2d 859, 870–71 (Minn.Ct.App.1988), *rev'd on other grounds*, 441 N.W.2d 793 (Minn.1989). The supreme court affirmed this court's ruling on the requested instruction in that case. *Hennum*, 441 N.W.2d at 800 n. 5.

### III

▮ The current law in Minnesota is that a bifurcated trial is *required* when the defendant pleads not guilty and also raises the defense of insanity. *See State v. Jackman*, 396 N.W.2d 24, 29 (Minn.1986) (applying Minn.R.Crim.P. 20.02, subd. 6(2)). The defendant who relies on the insanity defense is not denied due process by Minn.R. Crim.P. 20.03, which excludes such evidence as the defendant here wishes to present to mitigate his intent on the substantive charge. *Id.* The trial court did not err in denying Sanford's request for a unitary trial.

### IV

▮ Trial courts have broad discretion in sentencing; an appeals court generally will not modify a sentence which is within the presumptive range established by the Minnesota Sentencing Guidelines unless there are compelling reasons to do so. *State v. Kindem*, 313 N.W.2d 6, 7 (Minn. 1981). Consecutive sentencing for one behavioral incident involving two or more victims is permissible so long as the multiple sentences "do not unfairly exaggerate the criminality of the defendant's conduct." *State v. Norris*, 428 N.W.2d 61, 70 (Minn. 1988). Consecutive sentences for violent crimes against different people is clearly not error.

▮ The facts of this case would justify an upward departure. There was evidence presented at trial that Sanford permanently injured Linehan's cheek when he shot him. Infliction of permanent injuries is an aggravating factor. *State v. Van Gorden*, 326 N.W.2d 633, 634–35 (Minn.1982). Sanford's infliction of multiple blows to the

murder victims constitutes particular cruelty and justifies imposition of an upward sentencing departure. *See, e.g., State v. Kisch,* 346 N.W.2d 130, 133 (Minn.1984). Given these aggravating factors, it would not be an abuse of discretion to impose a presumptive sentence even if Sanford's alleged mental illness were proved and considered as a mitigating factor. *See State v. Wall,* 343 N.W.2d 22, 25–26 (Minn.1984). Further, the trial court did not give the maximum permissible sentence. It imposed a concurrent sentence for the death of the fetus.

V

Sanford opted out of the group of defendants that appealed the district court's denial of their motions to dismiss their indictments. He chose to continue to trial instead. The supreme court dismissed the indictments of defendants who remained parties to the appeal. *State v. Johnson,* 441 N.W.2d 460, 467 (Minn.1989). The court noted:

> We emphasize that our analysis applies only to these pretrial appeals. We do not suggest that defendants indicted by this grand jury who later pled guilty or were convicted are entitled to representment.

*Id.* at 466 n. 4. Johnson is therefore not entitled to representment to a new grand jury based on the analysis in *Johnson.*

■■■ It appears that a defendant who chooses to challenge an indictment after a trial on the merits has a heavier burden than on pretrial review:

> The general rule is a presumption of regularity attaches to the indictment, and it is a rare case where an indictment will be invalidated. * * * It flows from this presumption that a criminal defendant bears a heavy burden when seeking to overturn an indictment. This is especially true where, as here, the challenge is brought after appellant has been found guilty beyond a reasonable doubt following a fair trial. *A more appropri-*

*ate method of challenging an indictment is an appeal before trial on the merits.*

*State v. Scruggs,* 421 N.W.2d 707, 717 (Minn.1988), *quoted in Johnson,* 441 N.W.2d at 466–67 (emphasis supplied by the supreme court). Where presumptive prejudice is found, a defendant need not show actual prejudice. *Johnson,* 441 N.W.2d at 463. A presumption of prejudice may be overcome when the state shows the error was harmless beyond a reasonable doubt. *Id.* at 467.

■■■ The *Johnson* court ruled that certain actions by the prosecutor during the orientation of the grand jury, taken as a whole, seriously undermined the independence and integrity of the grand jury and therefore prejudiced the substantial rights of defendants who had not yet gone to trial. *Id.* at 466 (applying Minn.R.Crim.P. 17.06, subd. 2(2)(a)). Sanford argues that *Johnson* establishes presumptive error in his case as well and therefore we should dismiss his conviction or order a new trial.[1] Because *Johnson* expressly excludes posttrial appeals from its order, Sanford must show that some specific prejudice has occurred to him.

Sanford claims he was prejudiced by the indictment because the prosecutor had the advantage of a first degree murder indictment; the jury may have compromised in finding him guilty of second degree murder of two people and a fetus and attempted first degree manslaughter of the third person. This argument is premised on speculation of jury compromise, which this court is unwilling to adopt.

There is no evidence of jury compromise, and the evidence of premeditation was sufficient to warrant submission to the jury. Sanford talked to the victims earlier that morning; he knew they would be coming to his home and that they would be angry when they discovered he had moved their belongings. Although he normally kept his guns unlocked and in his closet, he loaded a

1. We note that because the jury acquitted Sanford on the indicted charges of first degree murder and attempted first degree murder, jeopardy has attached for these charges; the state may not represent his case for indictment and retry him for these particular charges. *See Burks v. United States,* 437 U.S. 1, 9–18, 98 S.Ct. 2141, 2146–51, 57 L.Ed.2d 1 (1978).

pistol, a shotgun and several rifles and placed them around his room. He let the three into his home and followed them upstairs. The wounds he inflicted are consistent with a conclusion that he attacked the victims. The jury did not accept that Sanford had committed first degree murder and made a careful distinction between the Linehan attempted manslaughter and the second degree murder of the other victims. Sanford has failed to prove he was prejudiced by the errors in the grand jury process; those errors were harmless and Sanford received a fair trial. *See United States v. Mechanik*, 475 U.S. 66, 73, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986) (finding presence of unauthorized person in the grand jury in violation of Fed.R.Crim.P. 6(d) was harmless error in light of guilty verdict after a fair trial).

### DECISION

There was sufficient evidence presented at trial to sustain the jury's verdict. The trial court did not abuse its discretion or otherwise commit error in refusing to instruct the jury on theories of self-defense that are not recognized in this state, in refusing Sanford's request for a unitary trial, or in refusing to depart downward in sentencing. Errors in the grand jury process were harmless as to Sanford.

Affirmed.