Victor David SANFORD, Petitioner,
Appellant,

v.

STATE of Minnesota, Respondent.

No. C8–92–1788.

Court of Appeals of Minnesota.

April 20, 1993.

Review Denied May 28, 1993.

Paul C. Engh, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty., Donna J. Wolfson, Asst. County Atty., Minneapolis, for respondent.

Considered and decided by KLAPHAKE, P.J., and SCHUMACHER and STONE *, JJ.

## OPINION

SCHUMACHER, Judge.

Following his conviction of three counts of murder in the second degree and one count of attempted manslaughter in the first degree, appellant Victor David Sanford moved for postconviction relief based on *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Sanford challenges the trial court's denial of his motion. We affirm.

## FACTS

In March 1988, Sanford met Charmine Deschl and Michael Rodaker, who were involved in selling drugs. The next month, Deschl and Rodaker began renting a room

---

* Retired judge of the district court, serving as judge of the Court of Appeals by appointment

pursuant to Minn. Const. art. VI, § 10.

from Sanford in a triplex owned by Sanford's mother. Deschl and Rodaker continued to sell drugs while living with Sanford. Neighbors complained to Sanford's mother about the drug traffic and she ordered Deschl and Rodaker to vacate the premises by May 11, 1988. They did not do so.

On May 12, 1988, Sanford, frustrated by Deschl and Rodaker's failure to leave, changed the locks. Unable to reach Deschl or Rodaker by phone, Sanford used a crowbar to get into their room. Once inside, Sanford bagged up their belongings. He carried the belongings out to the garage and put some of them in his car.

Sanford saw Deschl and Rodaker around 2 a.m. on May 13, 1988 and told them his mother had changed the locks. Three hours later, Sanford spoke with Rodaker by phone. He told Rodaker that he had removed Deschl and Rodaker's belongings from their room.

About 7 a.m. on May 13, 1988, Deschl, Rodaker, and George Linehan arrived at the triplex and saw that some of Deschl's belongings were in Sanford's car. Deschl was upset by this and wanted to call the police, but Rodaker talked her out of doing so. When Sanford opened the door, the three rushed past him and up the stairway. Sanford followed.

Sanford alleges that once upstairs, the three attacked him. The downstairs tenants testified they heard a heated argument, loud thudding noises, screams, calls for help, and a "pop" sound. Linehan then ran down the stairs calling for help.

When police arrived several minutes later, Sanford met them outside the triplex. Sanford expressed relief at their arrival, saying, "Thank God you're here. I had to shoot them." He led them to Linehan, who had been shot in the face with a .22 rifle. Linehan, who later died, identified Sanford as the one who had shot him.

The police found Deschl and Rodaker upstairs. Deschl had been stabbed 19 times and had a fractured skull. Rodaker had been stabbed six times and shot in the back of the head with a .41 pistol. Both were dead. Although Sanford claimed that

Linehan had hit him in the back of the head, Sanford was not visibly injured.

Sanford normally kept his firearms unloaded in his bedroom closet. On the morning in question, however, he had a loaded shotgun on his bed, a loaded .22 rifle behind his bedroom door, and a second loaded .22 rifle against the bedroom wall. Police also found Rodaker's .41 pistol on Sanford's bedroom table.

Sanford maintains that he was extremely afraid of Rodaker and Deschl and that several weeks before the killings, Rodaker had pointed his .41 pistol at Sanford and threatened to kill him. Also, Deschl apparently owned and often carried a .25 automatic pistol which Sanford had sold her. The three victims were unarmed on the morning of the shootings, however, and Sanford did not see any of the victims carrying a weapon that morning.

Sanford pleaded not guilty, claiming self-defense. He also raised the defense of insanity, prompting the trial court to order a bifurcated trial. In the first half of the trial, the jury convicted Sanford of three counts of murder in the second degree and one count of attempted manslaughter in the first degree. In the second half, the jury found that Sanford was not criminally insane at the time of the killings.

This court rejected Sanford's claim on appeal that the trial court abused its discretion in refusing to issue the following instructions:

Number 3. In order for a killing to be justified, the defendant must have acted honestly and in good faith, with a sincere belief that his actions were necessary to avert death or great bodily harm to himself, or to prevent the commission of a felony. The state has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense;

Number 4. To determine whether the defendant acted honestly and in good faith, you must evaluate the facts from the defendant's point of view. That is, you must evaluate what facts were apparent to defendant when he acted, and how he perceived them;

Number 5. If you find that the defendant acted sincerely and in good faith, but that his belief was unreasonable, you must find him guilty only of manslaughter in the first or second degree.

*State v. Sanford,* 450 N.W.2d 580, 586–87 (Minn.App.1990). This court noted that to justify the use of deadly force in self-defense under Minn.Stat. §§ 609.06 and 609.-065 (1988):

(1) The killing must have been done in the belief that it was necessary to avert death or grievous bodily harm.

(2) The judgment of the defendant as to the gravity of the peril to which he was exposed must have been reasonable under the circumstances.

(3) The defendant's election to kill must have been such as a reasonable man would have made in light of the danger to be apprehended.

*Id.* at 585 (citing *State v. Boyce,* 284 Minn. 242, 254, 170 N.W.2d 104, 112 (1969)). This court held that Sanford's proposed instructions were inconsistent with the objective requirements outlined in *Boyce* and approved in *State v. Housley,* 322 N.W.2d 746 (Minn.1982). *Id.* at 587.

This court further noted that in seeking instruction number 5, Sanford was attempting to obtain an "imperfect self-defense" instruction. *See People v. Flannel,* 25 Cal.3d 668, 160 Cal.Rptr. 84, 603 P.2d 1, 5 (Cal.1979). This "new defense" was rejected in *State v. Hennum,* 428 N.W.2d 859, 871 (Minn.App.1988), *rev'd on other grounds,* 441 N.W.2d 793 (Minn.1989).

After this court's affirmance of Sanford's conviction, the United States Supreme Court issued its decision in *Cheek.* Relying on *Cheek,* Sanford filed for postconviction relief on October 11, 1991.

Cheek, an American Airlines pilot, was convicted for his failure to file federal income tax returns since 1979. At trial, Cheek testified that he had been indoctrinated by a group that believed that the federal income tax system was unconstitutional. He further testified that this group sponsored meetings at which lawyers purported to give professional opinions that the federal income tax laws were invalid.

Cheek argued that since he sincerely believed that the tax laws were unconstitutional, he had not acted with the willfulness required to support his conviction.

The trial court in *Cheek* instructed the jury, in part, that "an honest but unreasonable belief is not a defense and does not negate willfulness." *State v. Cheek,* 882 F.2d 1263, 1266 (7th Cir.1989). This instruction was affirmed by the United States Court of Appeals for the Seventh Circuit. *Id.* at 1266. The United States Supreme Court reversed. Recognizing the general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution, the Court developed an exception with regard to certain violations of the tax code. The Court explained:

The proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws. Congress has accordingly softened the impact of the common law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses. Thus, the court almost sixty years ago interpreted the statutory term "willfully" as used in the federal criminal tax statutes as carving out an exception to the traditional rule. This special treatment of criminal tax offenses is largely due to the complexity of the tax laws.

*Cheek,* 498 U.S. at 199–200, 111 S.Ct. at 609. The Court reasoned:

Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty. * * * In this case, if Cheek asserted that he truly believed that the Internal Revenue Code did not purport to treat wages as income, and the jury believed him, the Government would not have carried its burden to prove willfulness, however unreasonable a court might deem such a belief.

*Id.* at 201–02, 111 S.Ct. at 610–11.

In his motion for postconviction relief, Sanford claimed this language from *Cheek*

entitled him to a jury instruction based on his subjective belief that he had justifiably acted in self-defense. The trial court denied his motion on July 22, 1992. It gave three reasons.

First, the few cases that have applied *Cheek* in non-tax situations have involved statutes which require a finding of "willfulness" to convict, whereas Sanford's conviction required no such finding. Second, the law under which Sanford was convicted lacks the complexity of the tax laws at issue in *Cheek*. Third, *Cheek* was decided on statutory grounds, and Sanford's constitutional arguments were thus not an appropriate basis for granting his requested relief.

## ISSUE

Does *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), entitle Sanford to postconviction relief?

## ANALYSIS

The pertinent question here is whether *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), compels the granting of postconviction relief in this matter. The standard of review of "a post-conviction proceeding is limited to the question of whether there is specific evidence to sustain the findings of the post-conviction court." *Marhoun v. State*, 451 N.W.2d 323, 327 (Minn.1990).

The Court in *Cheek* based its decision on the complexity of the tax laws. The Court believed that the "willfulness" requirement could not be met if the alleged violator was honestly confused about the meaning of the law. Thus, *Cheek* represented an exception to the general rule that ignorance of the law is no excuse.

*Cheek*'s scope has been discussed in several subsequent cases. Some courts have applied *Cheek* to cases involving statutes with a "willfulness" requirement. *Benjamin v. Bureau of Alcohol, Tobacco & Firearms*, 771 F.Supp. 307 (D.Or.1991), in-volved the revocation of a firearm vendor's license for "willfully" refusing to allow inspection of his inventory. The court cited *Cheek* and held that the vendor's subjective belief, even if unreasonable, determined the issue of willfulness. *Id.* at 310–11.

In *United States v. Moran*, 757 F.Supp. 1046 (D.Neb.1991), an owner of a movie rental business was convicted for violating a federal copyright statute with a "willful" requirement. The Court applied *Cheek* because it believed that in using the word "willful," Congress

> intended to soften the impact of the common-law presumption that ignorance of the law or mistake of the law is no defense to criminal prosecution.

*Id.* at 1049.[1]

Other courts have refused to apply *Cheek* in non-tax cases. In *United States v. Chaney*, 964 F.2d 437 (5th Cir.1992), a bank officer was convicted for willfully making false entries in the bank's books. The Fifth Circuit Court of Appeals held that *Cheek* was inapplicable because its holding was based on the particular complexity of the tax laws. *Id.* at 446 n. 25. A similar result was reached in *United States v. Remini*, 967 F.2d 754 (2nd Cir.1992), which involved a conviction for "willfully" violating a court order. In distinguishing contempt law from tax law, the Second Circuit Court of Appeals stated:

> There is nothing so complex about the law of contempt as to set it apart from the rest of the criminal law to which "ignorance * * * is no defense."

*Id.* at 758 (citing *Cheek*, 111 S.Ct. at 609); *see also United States v. Dashney*, 937 F.2d 532, 540 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991) (*Cheek* applies only to certain criminal tax statutes).

Other courts have stated that *Cheek* is inapplicable to mistake of fact cases. In *Lemon v. State*, 837 S.W.2d 163 (Tex.Ct. App.1992), *pet. for rev. granted* (Tex. Nov. 25, 1992), the defendant was convicted of

---

**1.** *See also Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1166 n. 4 (6th Cir.1991) (applying *Cheek* in prosecution under Age Discrimination in Employment Act would be appropriate because of its "willfulness" requirement); *People v. Weiss*, 191 Mich.App. 553, 479 N.W.2d 30 (1991) (*Cheek* applied in prosecution under Campaign Finance Act "knowingly" requirement).

**500**

misapplying fiduciary property. Defendant's basic assertion at trial was that due to a mistake of fact, he reasonably believed he had invested the money as the contract had required. The Texas Court of Appeals held that *Cheek* was inapplicable because the defendant was essentially pleading a mistake of fact. *Cheek*, noted the court of appeals, involved a misunderstanding of the tax laws. *Id.* at 166.

■ Sanford argues that the trial court should have instructed the jury to adjudicate his claim of self-defense from his perspective. Sanford argues that even if his belief that he was in danger of imminent bodily harm was unreasonable, he should nevertheless be acquitted if his belief was honestly held. Sanford thus argues a mistake of fact, rather than a mistake of law. He does not argue that Minn.Stat. §§ 609.-06, 609.065 (1988) are incomprehensible. Instead, Sanford argues that he killed Deschl, Rodaker, and Linehan because of his honest, though mistaken, belief that they posed a danger to him.

The trial court correctly held that *Cheek* does not entitle Sanford to postconviction relief. *Cheek*'s holding was premised both upon the complexity of the tax laws and Congress' intent to make specific intent an element of tax crimes. In short, *Cheek* was a mistake of law, rather than mistake of fact, case. *Cheek* does not govern the outcome in this case.

■ Sanford also argues that *Cheek* renders the bifurcation of insanity trials constitutionally suspect because that procedure prohibited him from explaining in a single trial why he believed that he was in danger. However, *Cheek* was based on an interpretation of the tax laws, not the Constitution. The trial court correctly held that the bifurcated trial rule remains sound in Minnesota. *See State v. Jackman*, 396 N.W.2d 24, 29 (Minn.1986).

For the above reasons, the order denying postconviction relief is affirmed.

**Affirmed.**